# In the United States Court of Federal Claims

No. 15-488L
(Filed:  September 30, 2019)

```
*************************************
TECHNICAL COLLEGE OF THE LOW      *
COUNTRY,                          *
                                  *
             Plaintiff,           *
                                  *
    v.                            *
                                  *
THE UNITED STATES,                *
                                  *
             Defendant.           *
*************************************
```

Rails-to-Trails; Trial; Liability; Valid
Property Interest; Standing; Waiver; Scope
of Easement; Just Compensation; Larger
Parcel Determination; Contiguity; Highest
and Best Use; Unit Rule; Deed Restriction;
Access; Comparable Sales; Adjustments;
Delay Damages; Attorney Fees and Costs

Thomas S. Stewart and Elizabeth McCulley, Stewart Wald & McCulley LLC, Kansas City, MO, for plaintiff.

Jessica M. Held and Davene D. Walker, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Chief Judge

In this Rails-to-Trails action, plaintiff Technical College of the Lowcountry ("Technical College") asserts that it owns real property adjacent to a former rail corridor in Beaufort County, South Carolina.[1]  Technical College asserts that until 2009, the South Carolina State Ports Authority ("Ports Authority") and its predecessors held easements for railroad purposes that abutted its land.  According to Technical College, defendant United States then authorized the conversion of the railroad rights-of-way into recreational trails pursuant to the National Trail Systems Act ("Trails Act"), conduct that resulted in a taking in violation of the Just Compensation Clause of the Fifth Amendment to the United States Constitution.  As explained below, the court concludes that defendant is liable for a taking and thus Technical College is owed just compensation of $755,165 in principal plus delay damages and attorney fees and costs in amounts yet to be determined.

---

[1]  The case caption depicts Technical College's name as "Technical College of the Low Country" based on the complaint and cover sheet that Technical College filed upon initiating this lawsuit.  However, Technical College's name is actually "Technical College of the Lowcountry" pursuant to its enabling legislation.  See S.C. Code Ann. § 59-53-910 (2002).

I. BACKGROUND ........................................................................................................... 3
   A. Statutory and Regulatory Context ........................................................................ 3
   B. Formation of Technical College ........................................................................... 4
   C. Initial Acquisition of the Land in Question .......................................................... 6
      1. The Rail Corridor ............................................................................................ 6
      2. The Technical College Campus ...................................................................... 6
   D. Size of the Rail Corridor ..................................................................................... 11
   E. Proceedings Before the Surface Transportation Board ........................................ 12
   F. Procedural History ............................................................................................... 13
II. LIABILITY .............................................................................................................. 13
   A. Legal Standards ................................................................................................... 13
   B. Ownership of Adjoining Land.............................................................................. 15
      1. Technical College Owned Adjacent Land as of the NITU's Issuance ................ 15
      2. Defendant Waived Its Argument Regarding the Ports Authority......................... 17
   C. Scope of Easement .............................................................................................. 20
   D. A Taking Occurred Upon Issuance of the NITU .................................................. 21
III. JUST COMPENSATION ......................................................................................... 21
   A. Standards for Decision ......................................................................................... 21
      1. Legal Standards............................................................................................. 21
      2. Appraisal Standards ...................................................................................... 22
   B. The Larger Parcel ................................................................................................ 24
      1. Contiguity ..................................................................................................... 24
      2. Unity of Ownership........................................................................................ 25
      3. Highest and Best Use ..................................................................................... 25
         a. Physically Possible .............................................................................. 27
         b. Legally Permissible ............................................................................. 27
         c. Financially Feasible ............................................................................. 27
         d. Profitability ......................................................................................... 28
      4. Analysis......................................................................................................... 28
   C. The Deed Restriction ........................................................................................... 30
   D. Access to the Island Parcel.................................................................................. 33
      1. Pedestrian Access.......................................................................................... 33
      2. Vehicular Access ........................................................................................... 34
   E. Comparable Sales Analysis .................................................................................. 36
      1. Description of the Sales Comparison Approach .............................................. 37
      2. Mr. Batson's Comparable Sales..................................................................... 38
      3. Mr. Matthews's Comparable Sales ................................................................ 39
   F. Principal Amount of Just Compensation .............................................................. 41
   G. Delay Damages ................................................................................................... 42
   H. Attorney Fees and Costs ...................................................................................... 43
IV. CONCLUSION........................................................................................................ 44

# I. BACKGROUND

## A. Statutory and Regulatory Context

During the last century, the United States began to experience a sharp reduction in rail trackage.[2] Preseault v. Interstate Commerce Comm'n, 494 U.S. 1, 5 (1990) ("Preseault I"). Congress was thus "[c]onfronted with the Hobson's choice of forfeiting a national rail system through piecemeal abandonment of lines, or forcing railroads to maintain tracks on which they [could not] turn a profit . . . ." Birt v. Surface Transp. Bd., 90 F.3d 580, 582 (D.C. Cir. 1996). To remedy this problem, Congress enacted several statutes, including the Trails Act. See generally Pub. L. No. 90-543, 82 Stat. 919 (1968) (codified as amended at 16 U.S.C. §§ 1241-1251 (2018)). The Trails Act, as amended, provides for the preservation of "established railroad rights-of-way for future reactivation of rail service" by authorizing the interim use of such rights-of-way as recreational and historic trails. 16 U.S.C. § 1247(d). This process is referred to as railbanking, and is overseen by the United States Surface Transportation Board ("Surface Transportation Board"), id., the federal agency with exclusive jurisdiction to regulate the "construction, acquisition, operation, abandonment, or discontinuance" of most railroad lines in the United States, 49 U.S.C. § 10501(b) (2012).

Before railbanking can occur, the railroad company must seek to abandon its line, either by initiating abandonment proceedings with the Surface Transportation Board pursuant to 49 U.S.C. § 10903, or by requesting that the Surface Transportation Board exempt it from such proceedings pursuant to 49 U.S.C. § 10502.[3] When considering the railroad company's abandonment application or exemption request, the Surface Transportation Board will entertain protests and comments from interested third parties. 49 C.F.R. §§ 1152.25(a), 1152.29(a) (2009). These third parties may submit requests for the interim use of the rail line as a recreational trail pursuant to 16 U.S.C. § 1247(d) and make offers of financial assistance pursuant to 49 U.S.C. § 10904. Id.

---

[2] Part I of this Opinion and Order contains the court's findings of fact as required by Rule 52(a)(1) of the Rules of the United States Court of Federal Claims ("RCFC"). The court derives these facts from the parties' Joint Stipulations ("Stip."); the transcript of testimony elicited during trial ("Tr."); the exhibits admitted into evidence during trial ("JX," "PX," or "DX"); relevant statutes, regulations, and prior decisions; and matters of which the court may take judicial notice pursuant to Rule 201 of the Federal Rules of Evidence. Citations to the trial transcript will be to the page number of the transcript and the last name of the testifying witness. Three witnesses testified during trial: Hayes Wiser, Technical College's Vice President for Administrative Services, Tr. 21 (Wiser); David Matthews, who was qualified as an expert appraiser on behalf of Technical College, id. at 82 (Matthews); and Keith Batson, who was qualified as an expert appraiser on behalf of defendant, id. at 211 (Batson).

[3] A railroad company cannot abandon its rail line without permission from the Surface Transportation Board. 49 U.S.C. § 10903(a)(1).

If an interested third party submits a trail use request to the Surface Transportation Board that satisfies the requirements of 16 U.S.C. § 1247(d), the Surface Transportation Board must then make the necessary findings pursuant to 49 U.S.C. § 10502(a) or 49 U.S.C. § 10903(d), as applicable.  Once the railroad company agrees to negotiate a trail use agreement with a potential trail operator, the Surface Transportation Board will issue one of two documents:  if the railroad company initiated abandonment proceedings, the Surface Transportation Board will issue a Certificate of Interim Trail Use or Abandonment ("CITU"); if the railroad company sought an exemption, the Surface Transportation Board will issue a Notice of Interim Trail Use or Abandonment ("NITU").  Id. § 1152.29(b)-(d).  The effect of both documents is the same—to "[p]ermit the railroad to discontinue service, cancel any applicable tariffs, and salvage track and materials, consistent with interim trail use and rail banking . . . ; and permit the railroad to fully abandon the line if no agreement is reached 180 days after the [CITU or NITU] is issued, subject to appropriate conditions . . . ."  Id. § 1152.29(d)(1); accord id. § 1152.29(c)(1).  When necessary, the Surface Transportation Board will entertain requests to extend the 180-day deadline to enable further negotiations.  Caldwell v. United States, 391 F.3d 1226, 1230 (Fed. Cir. 2004).

If the railroad company and the potential trail operator execute a trail use agreement, then abandonment of the rail line is stayed for the duration of the agreement.  16 U.S.C. § 1247(d); 49 C.F.R. § 1152.29(c)-(d).  Such railbanking "shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes."  16 U.S.C. § 1247(d).  "Thus, under the Trails Act, a conversion is treated as a mere discontinuance, and not as an abandonment."  Eldridge v. City of Greenwood, 503 S.E.2d 191, 200 (S.C. Ct. App. 1998) ("Eldridge I").

If no trail use agreement is executed, the railroad company is permitted to fully abandon the line.  49 C.F.R. § 1152.29(c)-(d).  To exercise its abandonment authority, the railroad company must "file a notice of consummation with the [Surface Transportation Board] to signify that it has . . . fully abandoned the line" within one year of "the service date of the decision permitting the abandonment."  Id. § 1152.29(e)(2).  Once the railroad company officially abandons the rail line, the Surface Transportation Board is divested of jurisdiction over the former rail line and "state law reversionary property interests, if any, take effect."  Caldwell, 391 F.3d at 1228-29 (citing Preseault I, 494 U.S. at 6-8); accord Birt, 90 F.3d at 582 (explaining that "the railroad's rights-of-way generally revert back to the adjoining landowners across whose property the tracks run" upon abandonment).  In the absence of a timely filed notice of consummation, however, the railroad company's authority to abandon the rail line automatically expires.  49 C.F.R. § 1152.29(e)(2).

## B.  Formation of Technical College

The South Carolina General Assembly ("General Assembly") created the State Board for Technical and Comprehensive Education ("State Board") in 1962 "as a continuing body and agency and instrumentality of the State" with members appointed by the governor.  S.C. Code Ann. § 59-53-10.  The State Board has "within its jurisdiction . . . all state-supported technical

institutions and their programs."[4]  Id. § 59-53-20.  To that end, the State Board is "responsible for the state-level development, implementation, coordination, and operation of an adequate and high quality post-high school vocational, technical, and occupational [education] financed in whole or in part by state funds."  Id. § 59-53-50(1).  In carrying out these responsibilities, the State Board "participate[s] in the various programs of federal aid to public, post-secondary, two-year institutions, and to the students therein."  Id. § 59-53-50(3) (emphasis added).

Although the State Board "establish[es] statewide policies and procedures necessary to insure educational and financial accountability for operation of the technical education institutions and their programs," it generally acts through area commissions.  Id. § 59-53-51.  The General Assembly formed the first set of area commissions in 1976.  1976 S.C. Acts 1723, 1727-30 (codified as amended at S.C. Code Ann. § 59-53-51).  Area commissions "are delegated primary responsibility for local governance and supervision of the individual institutions in compliance with all state laws by adoption of appropriate local policies and procedures which are consistent with state-level policies and procedures."  S.C. Code Ann. § 59-53-51.  The General Assembly set forth various powers and duties of the area commissions, including the acquisition of real property by gift, purchase, or otherwise (including eminent domain), and the construction of educational facilities thereon.  Id. § 59-53-52.

Prior to the establishment of area commissions, the Beaufort Area Trade School became known as the Beaufort Regional Training Center in 1970; the General Assembly then changed its name to Beaufort Technical College in 1979.  Mission/History, Tech. Coll. of the Lowcountry, https://www.tcl.edu/about-tcl/mission-history/ [http://web.archive.org/web/20190930192240/https://www.tcl.edu/about-tcl/mission-history/]. In 1986, the General Assembly formed the Beaufort Technical College Area Commission to "serve as the governing body of Beaufort Technical College," and designated the area commission as "a body politic and corporate" consisting of seven members recommended by the General Assembly and appointed by the governor, four of whom must reside in Beaufort County. 1986 S.C. Acts 3425, 3425-26 (codified as amended at S.C. Code Ann. § 59-53-910).  The General Assembly gave the Beaufort Technical College Area Commission the same powers and duties of area commissions as set forth in sections 59-53-10 through -100 of the South Carolina Code, and declared that Beaufort Technical College must be funded in the same manner as other state-supported technical colleges.  Id. at 3427 (codified at S.C. Code Ann. § 59-53-930).  In 2002, the General Assembly formally changed the name of Beaufort Technical College to "Technical College of the Lowcountry" and amended the name of its area commission accordingly.  2002 S.C. Acts 3260, 3263-64 (codified at S.C. Code Ann. § 59-53-910).

In its present form, Technical College is a "public, two-year institution of the State of South Carolina" that provides transfer education and technical and vocational training for approximately 2,500 students, Tr. 21-22 (Wiser), and is one of the twenty largest employers in Beaufort County, DX 3 at 22-23.  Its main campus is situated in the southwest portion of the city of Beaufort.  PX 1.A at 19.  The town of Port Royal is located adjacent to Beaufort along the

---

[4]  The State Board oversees sixteen state-supported technical colleges, including Technical College.  Tr. 23-24 (Wiser).

latter's southern border.  Id.  Beaufort County is part of the Lowcountry region of South
Carolina; along with Jasper County, it is one of the two southernmost coastal counties in the
state.  Id. at 13.

## C.  Initial Acquisition of the Land in Question

### 1.  The Rail Corridor

The General Assembly created the Port Royal Railroad Company by charter on
December 21, 1857.  McCrea v. Port Royal R.R. Co., 3 S.C. 381, 381 (1872).  Over time, the
Port Royal Railroad Company "acquir[ed] easements for portions of the rail line . . . through
condemnation [and] also acquired easements from certain landowners by written conveyances."
Ingram v. United States, 105 Fed. Cl. 518, 520 (2012).  Of the twenty-one total conveyances, ten
were executed in 1870, five were executed between 1873 and 1881, and the remaining six were
executed between 1929 and 1959.  Beaufort County, SC, Deed Book ("Deed Book") 433:723.[5]
As relevant here, the parties stipulated that "the applicable original source conveyances to the
[Port Royal Railroad Company] adjacent to the parcels owned by the Technical College
conveyed an easement to the railroad and the scope of the easement was limited to railroad
purposes."  Stip. ¶ 1.

After the Port Royal Railroad Company merged into Seaboard System Railroad, Inc.
("Seaboard"), the railroad rights-of-way were eventually transferred to the Ports Authority.
Ingram, 105 Fed. Cl. at 521.  That transfer took place via quitclaim deed on August 15, 1985.
Deed Book 433:722.  The quitclaim deed's expressed purpose was "to enable the [Ports
Authority] or its assigns to operate and maintain the Railroad spur line between the rail yard at
Yemassee and the marine terminal at Port Royal, South Carolina."  Id. at 724.  The spur line
stretched for approximately twenty-five miles from milepost AMJ-443.37 in Yemassee to
milepost AMJ-468.31 in Port Royal.  Id. at 722.

### 2.  The Technical College Campus

Although hundreds of individuals and entities owned land abutting the rail corridor, the
claim of only one landowner—Technical College—is at issue in the instant case.  See Tr. 281
(Batson) (agreeing that there were "hundreds of appraisals . . . done on this exact trail in prior
cases").

On August 12, 1968, the State of South Carolina ("State") purchased 27.046 acres of land
"to be used as an area trade school" from the Woman's American Baptist Home Mission
Society—now known as the American Baptist Home Mission Society ("Baptist Society")—for

---

[5] See Official Public Records Search, Beaufort Cty. Register of Deeds,
http://rodweb.bcgov.net/BrowserViewDMP/
[http://web.archive.org/web/20190930192423/http://rodweb.bcgov.net/BrowserViewDMP/]
(click on "Search," then "Book/Page," select "OR" from the drop-down menu, and enter
"433/723").

$502,122.  JX 1 at 1, 3, 5; DX 3 at 2.  The August 12, 1968 deed from the Baptist Society to the State contained the following recitations:

> [The Baptist Society] has granted, bargained, sold and released, and by these presents does grant, bargain, sell and release, unto the [State]:
>
> All that certain piece, parcel, or tract of land with all improvements thereon situate . . . .
>
> . . . .
>
> TOGETHER with all and singular the rights, privileges, hereditaments and appurtenances to the said premises belonging, or in anywise incident or appertaining;
>
> ON CONDITION, NEVERTHELESS, THAT this deed and conveyance shall be effective only so long as said premises are used for educational purposes without discrimination on the basis of race, color, creed or national origin, and for no other purposes, and whenever said premises hereby conveyed shall cease to be used for such educational purposes . . . , this deed and the estate conveyed thereby to the [State] shall cease, determine and be void and said premises, with all the rights, privileges and appurtenances appertaining to said premises shall automatically revert to the [Baptist Society] . . . .
>
> TO HAVE AND TO HOLD, all and singular said premises unto the [State], its successors and assigns forever, SUBJECT to the possibility of reverter hereinabove reserved by the [Baptist Society].

JX 1 at 1-2 (Deed Book 165:221-22).

Seven tracts of land comprised the August 12, 1968 conveyance.  They are listed below, along with their respective acreage, as identified by their Beaufort County tax map serial numbers:

- R120 005 000 0101 0000 ("101")[6]
- R120 005 000 0102 0000 ("102") = 16.735 acres (101 through 104)
- R120 005 000 0103 0000 ("103")
- R120 005 000 0104 0000 ("104")
- R120 005 000 0128 0000 ("128") = 0.603 acres

---

[6]  In other words, district 120, map 5, parcel 101.

- R120 005 000 0163 0000 ("163") = 2.736 acres
- R120 005 000 0190 0000 ("190") = 6.972 acres

Id. at 7-8 (Deed Book 3374:1964-65) (referencing Beaufort County, SC, Plat Book ("Plat Book") 140:30-34). Parcels 101 through 104, as well as a portion of parcel 163, are combined into parcel 102 because the property lines separating those parcels were "abandoned." PX 1.B at 47 (Plat Book 140:33).[7] The acreage for parcel 163 is exclusive of the portion of parcel 163 that was subsumed into parcel 102. Id. The acreages listed above are based on boundary surveys prepared in 2014, include the "critical coastal area" up to the location of the mean high tide (for parcels that have waterfront or abut marshland), and do not include any portion of the rail corridor. Id. at 47-49 (Plat Book 140:32-34) (surveys); JX 1 at 7-8 (Deed Book 3374:1964-65) (referencing Plat Book 140:30-34). The 2014 surveys are the most recent surveys referenced in the record. Compare, e.g., JX 1 at 7-8 (referencing the 2014 surveys of parcels 102, 128, 163, and 190), with DX 3 at 10 (referencing a 2008 survey of the entire rail corridor). The State later transferred parcels 102, 128, 163, and 190 to the Technical College of the Lowcountry Area Commission ("Area Commission") via quitclaim deed on January 14, 2015, JX 1 at 5-8 (Deed Book 3374:1962-65), for administrative convenience and to facilitate grant applications, Tr. 33 (Wiser).

In the meantime, on October 30, 1991, the Beaufort Technical College Area Commission purchased 3.46 acres from two private landowners for $400,000. Deed Book 585:2610-11; DX 3 at 10.[8] The acreage is based on a 2008 survey rather than the acreage recited in the deed (which is based on a 1990 survey). See id. Five parcels comprised the October 30, 1991 conveyance:

- R120 005 000 0163A 0000
- R120 005 000 0164 0000
- R120 005 000 0164A 0000
- R120 005 000 0165 0000
- R120 005 000 0165A 0000

Deed Book 585:2610. These parcels are collectively referred to as parcel 163A. Id.; DX 3 at 10.

Over the ensuing years, Technical College also acquired the following tracts:

_____

[7] See Official Public Records Search, supra n.5 (click on "Search," then "Book/Page," select "PLAT" from the drop-down menu, and enter "140/33").

[8] Mr. Batson incorrectly indicates that the October 30, 1991 conveyance is recorded in Beaufort County Deed Book 585 at page 610. DX 3 at 10. The deed is recorded in Deed Book 585 at page 2610.

| Date[9] | Parcel ID | Size (Acres) | Deed Book:Page | Paid |
|---|---|---|---|---|
| October 8, 1999 | R120 005 000 0129 0000 | 1.840 | 1255:1206-09 | $585,000 |
| December 5, 2000 | R120 005 000 132 0000 | 0.289 | 1361:2346-49 | $79,000 |
| June 3, 2002 | R120 005 000 133 0000 | 0.51 | 1589:2254-57 | $205,000 |
| October 25, 2002 | R120 005 000 132A 0000 | 0.329 | 1656:1617-18A | $228,000 |
| July 22, 2010 | R120 005 000 127 0000 | 0.433 | 2976:2480-83 | $159,400 |
| February 27, 2015 | R120 005 000 105 0000 | 0.54 | 3383:48-50 | $240,000 |

See DX 3 at 10.  The court refers to the above parcels as 129, 132, 133, 132A, 127, and 105, respectively, for ease of reference.

Parcels 102, 105, 127, 128, 129, 132, 132A, 133, and 163A constitute the western portion of the Technical College campus ("West Campus"), while parcel 190 is the eastern portion of the campus ("East Campus").  Tr. 93-94 (Matthews); PX 1.A at 12; PX 7.  The parties refer to parcel 163 as the Island Parcel.  See, e.g., PX 1.A at 13; DX 3 at 10.  Except for the Island Parcel, the parcels constituting the Technical College campus are contiguous.  PX 7.  Ribaut Road lies between West Campus and East Campus (collectively, "Main Campus"), but an underground pedestrian tunnel connects the two and allows students, staff, and visitors to move freely across the entire campus.  Tr. 25 (Wiser); see also PX 1.A at 8-9 (photographs 11-13).  A "signaled intersection" along Ribaut Road also "provides access to both sides of the campus."  DX 3 at 13. West Campus is bordered by the rail corridor, now known as the Spanish Moss Trail, see infra Section I.E, on its western boundary; approximately 1,400 linear feet of marshland on its southern boundary; and residential areas on its northern boundary.  Tr. 26, 30 (Wiser); PX 1.B at 14-15; PX 7; DX 1; DX 3 at 13.  East Campus lies between Ribaut Road and the Beaufort River, which provides approximately 1,000 linear feet of deep water access along East Campus's eastern boundary.  Tr. 25-26, 30 (Wiser); PX 1.B at 14; PX 7; DX 1; DX 3 at 13.  The Island Parcel lies south of West Campus, separated by marshland; it is an undeveloped tract with the Spanish Moss Trail on its western boundary.  Tr. 37 (Wiser); PX 1.A at 38; PX 7; DX 3 at 14.  A condominium complex—Rising Tide Condominiums—is located on the other side of the Spanish Moss Trail from the Island Parcel.  Tr. 39 (Wiser); PX 7; DX 3 at 14.  The complex is accessible via a private road known as Rising Tide Drive, which extends from its southernmost point (where Allison Road becomes Cottage Farm Drive) in a northerly fashion until it stops at the Spanish Moss Trail on the opposite side of the trail from the northwest corner of the Island Parcel.  Tr. 39-41 (Wiser), 95, 102 (Matthews); JX 4.A at 1; JX 4.B; PX 1.B at 3; PX 7; DX 3 at 34, 79.  The relevant portion of the Spanish Moss Trail is accessible via three locations:  the northwest corner of West Campus, the terminus of Rising Tide Drive, and Allison Road.  Tr. 37 (Wiser); DX 2 at 22; DX 3 at 34, 37; PX 1.A at 8-9 (photograph 31).

---

[9]  The dates referenced in the table are the dates the deeds were executed, rather than the dates of recordation.

The parcels are situated geographically as follows:



PX 7.

The parcels constituting Main Campus are zoned "General Residential," except for parcel 163A (listed as owned by Beaufort Technical College), which is zoned "Medical."  DX 3 at 14. The Island Parcel is zoned "Residential."  Id.

Land that is zoned "GR—General Residential"

> is intended to be developed and reserved for medium-to-high density residential purposes.  The regulations which apply within this district are designed to encourage the formation and continuance of a stable, healthy environment for several different types of dwellings situated on lots of 6,000 or more square feet, and to discourage unwarranted encroachment of commercial, industrial or other uses capable of adversely affecting the residential character of the district.

Id. at 30.  Typical permitted uses include "[s]ingle-family detached, two-family & three-family dwellings, townhouse dwelling, multifamily dwelling, home occupation, parks & open spaces, [and] minor utility."  Id.  Technical College's use of Main Campus is legally conforming under a conditional use permit.  Id.

Meanwhile, land that is zoned "R2—Residential"

> is intended to be developed and reserved for medium-density single-family residential purposes.  The regulations which apply within this district are designed to encourage the formation and continuance of a stable, healthy environment for single-family dwellings situated on lots of 9,000 square feet or more; and to discourage any encroachment by commercial, industrial or other use capable of adversely affecting the residential character of the district.

Id.  Typical permitted uses include "[s]ingle-family detached, home occupation, parks & open spaces, [and] minor utility."  Technical College's current use of the Island Parcel is legally conforming.  Id.

### D.  Size of the Rail Corridor

The rail corridor ran along the entire western boundaries of parcels 102 (the westernmost portion of West Campus) and 163 (the Island Parcel); it did not traverse or abut any other parcels at issue in this case.  PX 1.A at 35; PX 7; DX 3 at 10-11.  The rail corridor was 60.05 feet wide along the western boundary of West Campus, i.e., the center line of the corridor was 30.025 feet from the boundary.  DX 3 at 10, 59-62.  Along the western boundary of the Island Parcel, the rail corridor was 100.025 feet wide in each direction from the center line.  Id. at 11, 59-62.  The parties do not dispute the width of the rail corridor along either West Campus or the Island Parcel.  Tr. 189 (Matthews).

According to Mr. Batson, the western boundary of West Campus is 800.06 feet long, and the western boundary of the Island Parcel is 394.66 feet long.  DX 3 at 10-11.  The court credits these measurements because they are based on figures reflected in recorded plats of professional surveys.[10]  Id.; see also id. at 59-62 (excerpts of plats); PX 1.B at 47-49 (Plat Book 140:32-34).  Mr. Matthews, on the other hand, simply utilized figures provided to him by counsel.  E.g., Tr. 191-92 (Matthews).  During trial, Mr. Matthews measured the property lines himself using Google Earth and the Beaufort County Geographical Information System ("GIS"), and found both lengths to be slightly greater than those provided to him by counsel (1,170 feet versus 1,160

---

[10]  In his addenda, Mr. Matthews included a copy of a recorded plat of West Campus that supports Mr. Batson's 800.06-foot measurement.  See PX 1.B at 47 (Plat Book 140:33).

feet and 450 feet versus 440 feet, respectively).[11]  Tr. 185-86, 387-90 (Matthews).
Measurements taken by professional engineers for a land survey are more reliable than those
taken by an appraiser using Google Earth and GIS.  See DX 6 at 2 (Google Maps/Google Earth
Additional Terms of Service) ("[Y]ou may find that actual conditions differ from the map results
and Content, so exercise your independent judgment and use Google Maps/Google Earth at your
own risk.").

In short, the portion of the rail corridor abutting West Campus is 800.06 feet long and
30.025 feet wide (i.e., 0.55 acres), and the portion of the rail corridor abutting the Island Parcel is
394.66 feet long and 100.025 feet wide (i.e., 0.91 acres).[12]

### E.  Proceedings Before the Surface Transportation Board

In 1984, the Interstate Commerce Commission (the predecessor to the Surface
Transportation Board) granted Seaboard permission to abandon the 25-mile rail line at issue in
the instant case.  Beaufort R.R. Co.—Modified Rail Certificate, No. 34943, 2009 WL 1416460,
at *1 (S.T.B. May 20, 2009).  However, Seaboard did not exercise its authority to abandon the
rail line.  Id.  As described above, Seaboard instead transferred its interest in the rail line to the
Ports Authority.  Id.  The Ports Authority leased the line to another state agency, which operated
the rail line through various subsidiaries—Tangent Transportation Company, Inc. from 1985
through 2003 and Beaufort Railway Company, Inc. ("Beaufort Railway") beginning in 2006.  Id.
at *1-2.  In March 2008, after various parties contested the authority of Beaufort Railway to
operate the rail line, the Surface Transportation Board specified that the rail line was not
abandoned in 2003 and reiterated Beaufort Railway's authority to operate the rail line.  Id. at *2.

On May 30, 2008, the Ports Authority and the Beaufort-Jasper Water and Sewer
Authority ("BJWSA") executed an interim trail use and railbanking agreement that was
contingent upon the Surface Transportation Board issuing a NITU.  Id. at *7; Ingram, 105 Fed.
Cl. at 521-22.  On July 16, 2008, Beaufort Railway notified the Surface Transportation Board of
its intent to terminate service "over the entire line."  Beaufort R.R. Co., 2009 WL 1416460, at
*7.  That same day, the Ports Authority and the BJWSA filed a joint request for a NITU.  Id.  On
May 20, 2009, the Surface Transportation Board determined that the Ports Authority and the
BJWSA had satisfied the requirements for a NITU and granted their request.  Id. at *7-8.

---

[11]  It appears that Mr. Matthews measured beyond the high water mark with respect to
both West Campus and the Island Parcel.  Compare, e.g., PX 1.B at 14-15 (showing the West
Campus boundary to the high water mark), with id. at 25 (showing the West Campus boundary
as measured on the GIS system).  Because "property ownership extends to [the] high water
mark" in South Carolina, property boundaries extend only to the "approximate location of [the]
mean high tide . . . per tidal benchmark."  Id. at 47 (Plat Book 140:33); accord Query v. Burgess,
639 S.E.2d 455, 456 (S.C. Ct. App. 2006).

[12]  One acre equals 43,560 square feet.  Acre, Black's Law Dictionary (11th ed. 2019).

Shortly thereafter, on November 5, 2009, the Ports Authority quitclaimed its interest in the rail corridor to the BJWSA. Ingram, 105 Fed. Cl. at 522. The deed contained a recitation that the conveyance was "subject to and in conformance with" the provisions of both the Trails Act, 16 U.S.C. § 1247(d), and the May 30, 2008 interim trail use and railbanking agreement between the Ports Authority and the BJWSA. Id. Thus, the BJWSA became the trail sponsor, and the railroad rights-of-way were converted to interim trail use with the possibility of reactivation. Id. The BJWSA constructed the Spanish Moss Trail in 2012. Tr. 37 (Wiser).

## F.  Procedural History

Technical College filed suit in this court on May 12, 2015, to seek redress for the alleged taking of its right to enjoy the land underlying the former rail corridor unburdened by a perpetual trail use easement. See Compl. ¶¶ 8-9. After defendant answered Technical College's complaint, the parties requested and received a stay of proceedings to allow them to pursue settlement. The parties did not reach settlement and scheduled the case for trial. The court conducted a two-day valuation trial on October 4 and 5, 2016, in Washington, DC. During trial, defendant moved for dismissal for lack of standing on the sole ground that Technical College did not possess a valid property interest at the time of the NITU. The court denied that motion without prejudice and ordered the parties to address the issue as part of their posttrial briefing. Following the conclusion of posttrial briefing, on May 23, 2017, the court heard closing arguments and argument pertaining to defendant's motion to dismiss on May 23, 2017. The case was reassigned to the undersigned for decision on July 22, 2019. The undersigned then ordered supplemental posttrial briefing, which is now complete.

## II.  LIABILITY

Although the parties characterized the trial as a valuation trial, they did not stipulate to all elements of liability. Therefore, the court must first determine whether defendant is liable for a taking before it can consider the amount—if any—of just compensation owed to Technical College. See Ultra-Precision Mfg. Ltd. v. Ford Motor Co., 338 F.3d 1353, 1359 (Fed. Cir. 2003) ("[D]amages evidence is irrelevant if [the plaintiff] is unable to prove the merits . . . . Without a determination of liability, there can be no damages . . . .").

## A.  Legal Standards

As noted above, the sole claim for relief in Technical College's complaint is a Fifth Amendment taking. The Fifth Amendment prohibits the federal government from taking private property for public use without paying just compensation. U.S. Const. amend. V. The United States Court of Federal Claims ("Court of Federal Claims") possesses subject-matter jurisdiction to entertain Fifth Amendment takings claims against the United States, 28 U.S.C. 1491(a)(1) (2018); Jan's Helicopter Serv., Inc. v. FAA, 525 F.3d 1299, 1309 (Fed. Cir. 2008), such as claims premised upon the conversion of a railroad right-of-way into a recreational trail pursuant to the Trails Act, Preseault I, 494 U.S. at 12-13.

To establish a taking, a plaintiff must first "identif[y] a cognizable Fifth Amendment property interest that is asserted to be the subject of the taking." Casitas Mun. Water Dist. v. United States, 708 F.3d 1340, 1348 (Fed. Cir. 2013). In determining whether a plaintiff has demonstrated the existence of a valid property interest in a Rails-to-Trails case, the court must consider:

> (1) who owned the strips of land involved, specifically did the Railroad . . . acquire only easements, or did it obtain fee simple estates; (2) if the Railroad acquired only easements, were the terms of the easements limited to use for railroad purposes, or did they include future use as public recreational trails; and (3) even if the grants of the Railroad's easements were broad enough to encompass recreational trails, had these easements terminated prior to the alleged taking so that the property owners at that time held fee simples unencumbered by the easements.

Preseault v. United States, 100 F.3d 1525, 1533 (Fed. Cir. 1996) (en banc) ("Preseault II"). Then, "if the court concludes that a cognizable property interest exists, it determines whether the government's action amounted to a compensable taking of that interest." Casitas, 708 F.3d at 1348. In Rails-to-Trails cases, a taking occurs "when government action destroys state-owned property rights by converting a railway easement to a recreational trail, if trail use is outside the scope of the original railway easement." Ladd v. United States, 630 F.3d 1015, 1019 (Fed. Cir. 2010); accord Thomas v. United States, 106 Fed. Cl. 467, 474 (2012) ("If the railroad receives only a railroad purpose easement and if the recreational trail use and railbanking authorized by the NITU exceed the scope of that easement and thereby prevent expiration of the easement and reversionary interests from vesting in the fee owners, then a Fifth Amendment taking has occurred."). It is well settled that the Surface Transportation Board's issuance of "[t]he NITU is the government action that prevents the landowners from possession of their property unencumbered by the easement."[13] Ladd, 630 F.3d at 1023; accord Barclay v. United States, 443 F.3d 1368, 1374 (Fed. Cir. 2006); Caldwell, 391 F.3d at 1233-34.

---

[13] "[W]hen the NITU is issued the claim has accrued and the statute of limitations period commences." Ladd, 630 F.3d at 1023. To fall within this court's subject-matter jurisdiction, a complaint must be "filed within six years after such claim first accrues." 28 U.S.C. § 2501. The six-year limitations period is an "absolute" limit on the ability of the Court of Federal Claims to exercise jurisdiction and reach the merits of a claim. John R. Sand & Gravel Co. v. United States, 552 U.S. 130, 133-35 (2008). Because Technical College filed its complaint on May 12, 2015—less than six years after the Surface Transportation Board issued the NITU—its complaint is timely.

## B. Ownership of Adjoining Land

As a preliminary matter, the court must determine whether Technical College owned land adjacent to the former rail corridor as of the NITU's issue date. Under South Carolina law, when a railroad company obtains an easement for railroad purposes, the rail corridor "revert[s] to present adjoining landowners when no longer used as a railroad." Goldman v. RBC, Inc., 632 S.E.2d 850, 852 (S.C. 2006). Further, it has long been recognized in South Carolina that when a railroad company enjoys only an easement (rather than fee simple title) with respect to the rail corridor, there is a "rebuttable presumption" that the adjoining property owners own to "the center of the railroad track," even when the rail corridor is listed as a boundary in a deed or plat. Boney v. Cornwell, 109 S.E. 271, 274 (S.C. 1921). Defendant has not offered any evidence to rebut the center-line presumption. Further, as described above (and as the parties agree), parcels 102 and the Island Parcel are adjacent to the former rail corridor. Thus, if Technical College is considered to have owned parcel 102 and the Island Parcel as of May 20, 2009, then it has a valid property interest that was potentially subject to a Fifth Amendment taking.

### 1. Technical College Owned Adjacent Land as of the NITU's Issuance

It is undisputed that the State acquired parcel 102 and the Island Parcel from the Baptist Society in 1968, and that those parcels were conveyed by quitclaim deed to the Area Commission on January 14, 2015. Rather, the parties dispute the import of title being held in the name of the State versus Technical College or the Area Commission. Defendant argues that "Technical College offered no evidence establishing that it had any ownership interest in the property on May 20, 2009 . . . [n]or did the Technical College establish that the [State] authorized [Technical College] to bring suit on the State's behalf," and thus "Technical College has no standing to pursue the claim asserted in this action." Def.'s Mot. Dismiss 3. Technical College avers that it "is a division of the State." Pl.'s Resp. 11.

Technical College is correct that, under the statutory scheme promulgated by the General Assembly, it and the Area Commission are divisions of the State. First, the State Board that ultimately oversees Technical College is indisputably a State agency. See S.C. Code Ann. § 59-53-10 (designating the State Board "as a continuing body and agency and instrumentality of the State"). The State Board acts not as a mere regulator, but rather as the operator of "state-supported" vocational, technical, and occupational postsecondary schools. Id. §§ 59-53-20, -50(1). Second, the General Assembly specifically describes such schools— including Technical College—as "public" institutions.[14] Id. § 59-53-50(3). In particular, the General Assembly created the Area Commission as a "body politic." Id. § 59-53-910. Third, the General Assembly "delegated primary responsibility for local governance and supervision" of Technical College to the Area Commission in a manner "consistent with state-level policies and procedures." Id. § 59-53-51 (emphasis added). In other words, the Area Commission acts as an

---

[14] In the South Carolina Tort Claims Act, the General Assembly defines technical colleges as State agencies, and defines "State" as including each of the technical colleges. S.C. Code Ann. § 15-78-30(a), (e). The South Carolina State Employee Grievance Procedure also defines technical colleges as State agencies. Id. § 8-17-320(1).

extension of the State Board in operating a statewide program.  See id. § 59-53-20 ("All courses, programs, and institutions within the jurisdiction of the [State Board] must be identified and administered as the South Carolina Technical Education System.").  To that end, the Area Commission has the same powers and duties as other area commissions throughout South Carolina and must be funded in the same manner as other public vocational, technical, and occupational postsecondary schools in South Carolina. Id. § 59-53-930.  Fourth, the Area Commission has several powers, including the power of eminent domain—a quintessential state power—within its geographic region. Id. § 59-53-52.  The South Carolina Office of the Attorney General, discussing the Area Commission specifically, has explained that "the exercise of these powers by any area commission would be the exercise of a portion of the sovereign power of the State."  Letter from Asst. Att'y Gen. Patricia D. Petway to Rep. Juanita N. White (Aug. 6, 1990), 1990 WL 599272 (S.C.A.G.).  Fifth, the General Assembly considers all employees of Technical College and the Area Commission to be state employees.  S.C. Code Ann. § 59-53-20.  In 1994, for instance, the South Carolina Court of Appeals examined certain regulations and an employment contract of a former Technical College employee that described him as a state employee.  Moshtaghi v. The Citadel, 443 S.E.2d 915, 917 (S.C. Ct. App. 1994) (per curiam).  Sixth, the United States Court of Appeals for the Fourth Circuit recognizes that "the enabling and governing legislation" for technical colleges in South Carolina "make[] it clear" that each technical college "is a governmental unit of the State."  Henry v. Denmark Tech. Coll., 869 F.2d 593 (4th Cir. 1989) (table) (unpublished per curiam decision).  The South Carolina Court of Appeals has also referred to Technical College itself as an "agency or institution of State Government," Moshtaghi, 443 S.E.2d at 917, as did Mr. Batson during trial, Tr. 223 (Batson) ("They're an agency of the State Government.").  Finally, the delineation between Technical College and the Area Commission is a distinction without a difference.  The General Assembly designed the Area Commission to serve as Technical College's governing body.  S.C. Code Ann. § 59-53-910.  For instance, real property and personal property belonging to the Technical College are "the possession of the [A]rea [C]ommission," id. § 59-53-52(3), and the Area Commission must "[e]xercise responsibility for the operation, maintenance and improvement of [Technical College's] facilities," id. § 59-53-52(7).  In addition, the Area Commission must "[e]mploy [Technical College's] president" and "such other personnel as may be deemed necessary." Id. § 59-53-52(8)-(9).

Because there is no meaningful difference between Technical College and its Area Commission, it is of no moment that parcels 102 and the Island Parcel (as well as parcel 128 and East Campus) were deeded to the Area Commission rather than Technical College.  Indeed, the Beaufort County Treasurer does not distinguish between the two.  See PX 1.B at 26 (property tax information for parcel 102 listing the owner as Technical College rather than the Area Commission).  Thus, the court will refer to all such parcels as being owned by Technical College for the sake of simplicity.

The court also observes that in 1976, the General Assembly specified that all real property belonging to technical schools was to be held by their respective area commissions, "except for those campuses currently owned by the State."  S.C. Code Ann. § 59-53-52(3).  At that time, Technical College was operating as the Beaufort Regional Training Center and the State had already acquired the bulk of the land constituting the school's campus (including parcel 102 and the Island Parcel).  Thus, the General Assembly explicitly allowed the land to remain

titled to the State.  There was no need to retitle the land to the Beaufort Technical College Area Commission when it was created in 1986, or to Technical College or the Area Commission following the 2002 renaming.  Moreover, the General Assembly could have, in conjunction with either event, required retitling of the land, but chose not to do so.  Thus, the General Assembly approves of Technical College holding its land in the State's name.  The land was only retitled in 2015 for administrative convenience and to facilitate grant applications.  Tr. 33 (Wiser).  In other words, as relevant here, Technical College is merely a more specific reference to, and an agent of, the State.

To the extent that there is a meaningful distinction between the State, the Area Commission, and Technical College, the State only nominally held the land constituting the Technical College campus for the benefit of Technical College.  Technical College was the beneficial owner of the land since its inception, and thus the real party in interest, despite the administrative paperwork to recognize its ownership not having been filed at that time. Moreover, Technical College brought this lawsuit at the direction and with the approval of its president, Richard Gough.  Id.  As Technical College's president, Dr. Gough is both a State employee and an Area Commission employee with the powers and duties to act within his sphere of responsibility.  Such powers certainly include initiating lawsuits to protect the interests of Technical College and, by extension, the State.  Cf., e.g., S.C. Code Ann. §§ 15-78-10(a) ("[E]ach governmental entity has financial limitations within which it must exercise authorized power and discretion in determining the extent and nature of its activities."), -30(i) (defining "[s]cope of official duty" and "scope of state employment" as "(1) acting in and about the official business of a governmental entity and (2) performing official duties"), -40 (making Technical College "liable for [its] torts in the same manner and to the same extent as a private individual under like circumstances").  As Technical College observes, technical colleges in South Carolina "often" participate in litigation in their own names—both offensively and defensively—in a variety of civil matters.  Pl.'s Resp. 14; see, e.g., Graves v. Horry-Georgetown Tech. Coll., 704 S.E.2d 350, 352 (S.C. Ct. App. 2010) (employment) (defensive litigation); Aiken Tech. Coll. v. Two State Constr. Co., No. 2005-UP-605, 2005 WL 7084869, at *1 (S.C. Ct. App. Dec. 1, 2005) (negligence, breach of contract, and breach of implied and express warranties) (offensive litigation); Greer v. Spartanburg Tech. Coll., 524 S.E.2d 856, 858 (S.C. Ct. App. 1999) (per curiam) (constitutional violation) (defensive litigation).

In short, Technical College owned West Campus, East Campus, and the Island Parcel as of May 20, 2009 (except for parcels 105 and 127, which the Technical College acquired later).

## 2. Defendant Waived Its Argument Regarding the Ports Authority

Defendant also argues—for the first time on August 22, 2019, during supplemental posttrial briefing—that if both the Ports Authority and Technical College are divisions of the State, Technical College "does not have standing to bring this suit and cannot prevail."  Def.'s Supp. Posttrial Resp. Br. 3.  Defendant avers that under Technical College's theory of the case, the State "is responsible for an injury to itself."  Id.  Defendant acknowledges that it raises this argument for the first time in its supplemental posttrial brief, but avers that its timing is not problematic because "[s]tanding is a jurisdictional issue" and the court may dismiss an action "at any time" upon a determination "that it lacks subject-matter jurisdiction."  Id. at 4.  Meanwhile,

-17-

Technical College contends that "the fact that the Ports Authority may also be a part of the [State] does not impact this litigation at all" because defendant "has waived and/or forfeited that issue under [RCFC] 12(h)(2)."  Pl.'s Supp. Posttrial Br. 12.

Defendant is correct that it may raise a jurisdictional issue at any time.  See RCFC 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."); Arbaugh v. Y & H Corp., 546 U.S. 500, 506 (2006) ("The objection that a federal court lacks subject-matter jurisdiction may be raised by a party, or by a court on its own initiative, at any stage of the litigation, even after trial and the entry of judgment." (citation omitted)); see also Jeun v. United States, 128 Fed. Cl. 203, 209-10 (2016) (collecting cases). However, the court is not required to analyze defendant's standing argument concerning the Ports Authority under the guise of subject-matter jurisdiction simply because defendant labels it as such.  See, e.g., Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1313 (Fed. Cir. 2007) (rejecting the plaintiff's characterization of its argument as a challenge to the agency's evaluation of its proposal, and instead characterizing it as a challenge to the terms of a solicitation).  Whether the State "is responsible for an injury to itself" (as defendant argues) and thus cannot prevail is actually a merits inquiry, not an issue of standing, because it concerns whether Technical College can prevail and not whether Technical College may bring this suit in the first instance.  See Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 128 n.4 (2014) ("[T]he absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, i.e., the court's statutory or constitutional power to adjudicate the case." (internal quotation marks omitted)).

Dismissal "for failure to state a claim upon which relief can be granted is appropriate when the facts asserted by the claimant do not entitle [it] to a legal remedy."  Lindsay v. United States, 295 F.3d 1252, 1257 (Fed. Cir. 2002).  The defense of failure to state a claim upon which relief can be granted can be raised in a pleading, in an RCFC 12(c) motion for judgment on the pleadings, or at trial.  RCFC 12(h)(2); see also RCFC 12(c) (providing that a motion for judgment on the pleadings must be filed "early enough not to delay trial").  In other words, the latest that such a defense can be raised is at trial.  It cannot be raised for the first time after trial. Defendant's conclusory statement in its answer that Technical College's complaint "should be dismissed for failure to state a claim upon which relief can be granted," Answer 3, does not preserve its ability to supply the basis for that defense for the first time over four years later during supplemental posttrial briefing.  Cf. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) ("A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do.  Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." (citations and internal quotation marks omitted)).  Unlike its stance regarding Technical College's ownership of parcel 102 and the Island Parcel, defendant did not raise the issue concerning the Ports Authority prior to trial, and introduced no evidence (or even argument) in that regard during trial, despite knowing Technical College's theory of the case since the inception of the case.  Therefore, defendant has waived the issue.[15]

_____

[15] Under RCFC 15(b), a party may seek to amend its pleadings to conform to the evidence presented at trial, although such amendment is not necessary for issues tried by consent. Bowles v. United States, 144 Fed. Cl. 240, 249 (2019).  Defendant does not attempt to invoke

Defendant makes essentially the same argument that it did in Balagna v. United States, a Rails-to-Trails action decided by another judge of this court.  In Balagna, the trail operator and two of the plaintiffs were municipal corporations of the same state.[16]  135 Fed. Cl. 16, 20-21, 26 (2017).  The federal government argued that it was not liable for a taking with respect to those two plaintiffs because the trail operator "acted on behalf of the state when it invoked the Trails Act."  Id. at 26.  In doing so, the Department of Justice correctly recognized that whether those two plaintiffs were entitled to compensation was a merits argument rather than a jurisdictional inquiry, and moved for partial summary judgment.  See Def.'s Mot. Partial Summ. J. 8, Balagna v. United States, No. 14-21L (Fed. Cl. Aug. 5, 2016).  The court determined that it "ha[d] jurisdiction over th[e] action," Balagna, 135 Fed. Cl. at 21, but the two municipal-corporation plaintiffs were "not entitled to compensation" since the plaintiffs and the trail operator were all state entities, id. at 27.  The federal government's argument was properly before the Balagna court because it was raised in a pretrial motion for summary judgment.  Id. at 21.  Here, however, defendant did not raise the issue of the Ports Authority being a state entity until nearly three years after trial, and thus the issue is not properly before the court.  Accordingly, Balagna is not applicable to the instant case.[17]

In any event, Technical College has established that it has standing to bring the instant lawsuit.  Establishing standing under Article III's case-or-controversy requirement requires an injury in fact, causation, and redressability.  Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992)).  In stating its position, defendant acknowledges that Technical College has suffered an injury (albeit purportedly self-inflicted).  Further, the parties do not dispute that (1) to the extent that Technical College has suffered an injury, it is traceable to the NITU; and (2) such injury would be redressed by a favorable decision here.

Accordingly, the court must deny defendant's motion to dismiss for lack of standing.

---

this rule, nor could it, since the issue concerning the Ports Authority was not raised until nearly three years after trial.

[16]  The Balagna court's focus on the relationship between the plaintiff and the trail sponsor—rather than, as here, the relationship between the plaintiff and the former railroad company—is of no moment.  As is typical in Rails-to-Trails cases, the Ports Authority (the former railroad company) and the BJWSA (the trail sponsor) jointly requested the NITU.

[17]  Technical College also relies on Glosemeyer v. United States—another Rails-to-Trails action discussed in Balagna—in support of its waiver argument.  See Pl.'s Supp. Posttrial Reply Br. 3.  In Glosemeyer, one of the plaintiffs was a municipality, and the trail sponsor was a nonprofit corporation.  45 Fed. Cl. 771, 774 (2000).  Nevertheless, the court had "little difficulty concluding that a taking [had] occurred," id. at 781, recognizing that state entities can recover in this court for takings by the federal government.  Defendant does not contest that proposition. Balagna and Glosemeyer, like the instant case, both involved plaintiffs that were state entities. The Balagna court distinguished Glosemeyer on other grounds:  the trail sponsor in Glosemeyer was a nonprofit entity, not another state entity.  Balagna, 135 Fed. Cl. at 27.

## C. Scope of Easement

Having determined that Technical College owned land adjacent to the rail corridor as of the NITU's issue date, the court now turns to the nature of the Port Authority's interest in that corridor. Preseault II, 100 F.3d at 1533. As noted above, the parties stipulated that "the applicable original source conveyances to the [Port Royal Railroad Company] adjacent to the parcels owned by the Technical College conveyed an easement to the railroad and the scope of the easement was limited to railroad purposes." Stip. ¶ 1.

The phrase "railroad purposes" has a narrow application under South Carolina law. For example, in Eldridge I, the appellant relied on the "shifting public uses doctrine" in arguing that "use of the old railway for public highway purposes is consistent with the railroad's easement." 503 S.E.2d at 201. The court rejected that theory in favor of a "strict but literal interpretation" of railroad purposes, finding that a public highway was beyond the scope of the railroad easement. Id. at 203. As part of its analysis, the court cited with approval several decisions from other states—including one by another judge of this court analyzing Maryland law—where "change in use of a right of way from a railway to a public recreational trail extinguished the easement." Id. at 202. More recently, in Palmetto Conservation Foundation v. Smith, a railroad company held an easement for railroad purposes in an eleven-mile rail corridor in South Carolina. 642 F. Supp. 2d 518, 521 (D.S.C. 2009). Pursuant to the Trails Act, the railroad transferred its interest in that easement to the plaintiff for conversion of the rail corridor into a public recreational trail subject to railbanking. Id. The dispute centered on the defendant's ability to occupy and make use of the land underlying the former rail corridor. Id. at 522-23. The court agreed with the defendant that the plaintiff's "use of the subject property" as a public recreational trail subject to railbanking exceeded the scope of the railroad easement, but concluded that the plaintiff was "entitled to exclusive use of the subject property" as long as that use was "for purposes of the trail" because the plaintiff's remedy, if any, was "under the Tucker Act to possibly assert a Fifth Amendment takings claim." Id. at 531 (citing Toews v. United States, 376 F.3d 1371, 1376-77 (Fed. Cir. 2004)).

Finally, in James v. United States, another judge of this court, analyzing South Carolina law, described "recreational trail use and railbanking as beyond the scope of the railroad purposes easements" held by the railroad. 130 Fed. Cl. 707, 731 (2017). The railroad company in James had acquired an easement that, pursuant to state charter, it was entitled to "have, hold and enjoy . . . as long as the [easement] may be used only for the purposes of the said [railroad], and no longer . . . ." Id. at 730 (quoting 1846 S.C. Acts 388). Therefore, the court explained, a railroad-purposes easement under South Carolina law "does not contemplate preservation of a railroad corridor for other future uses, or railbanking." Id. The court reasoned that when it issued the NITU, the Surface Transportation Board "authoriz[ed] the railroad's easements to be used for recreational trail use, with attendant railbanking," and therefore "the easements limited for railroad purposes were exceeded." Id. at 732; accord Toews, 376 F.3d at 1376 ("[I]t appears beyond cavil that use of these easements for a recreational trail . . . is not the same use made by a railroad . . . . The different uses create different burdens."); Beres v. United States, 104 Fed. Cl. 408, 442 (2012) ("[E]ven the general outlines of the interest, railroad use, encompass far different uses than use as a public recreational trail for walking, biking, and hiking. Even if all

the activities were to take place within the same space of the rail corridor, it would not mean that all the activities are covered by the original prescriptive easement.").

In sum, under South Carolina law, if the railroad company has only an easement limited to railroad purposes, conversion of the railroad right-of-way to a public recreational trail—even if subject to railbanking—is beyond the scope of the easement. Therefore, Technical College has identified a cognizable Fifth Amendment property interest that it asserts was subjected to a taking.

### D.  A Taking Occurred Upon Issuance of the NITU

Technical College owned parcel 102 and the Island Parcel as of May 20, 2009, and thus—based on the center-line presumption—to the center of the portion of the former rail corridor that is adjacent to the western boundary of each of those parcels.  Before transferring its interest in the former rail corridor to the BJWSA on November 5, 2009, the Ports Authority held only an easement limited to railroad purposes.  Conversion to a public recreational trail, even with the possibility of railbanking, is beyond the scope of a railroad easement under South Carolina law.  When the Surface Transportation Board issued the NITU on May 20, 2009, and allowed the Ports Authority to execute a trail use agreement with the BJWSA, it prevented Technical College from being able to enjoy the use of its land underlying the rail corridor unencumbered.  Moreover, the interim trail use and railbanking agreement between the Ports Authority and the BJWSA that became effective upon the issuance of the NITU made Technical College's inability to enjoy the use of its property indefinite.

Accordingly, under Ladd, Barclay, and Caldwell, the Surface Transportation Board's issuance of the subject NITU on May 20, 2009, effected a taking of Technical College's property, and the execution of a trail use agreement made that taking permanent.

### III.  JUST COMPENSATION

The court now turns to the matter of determining the amount of just compensation owed to Technical College for the taking of its property.  The experts' testimony revealed four major areas of dispute:  (1) identifying the specific parcels to be analyzed; (2) the import of the restriction in the Baptist Society deed; (3) whether Technical College lost access to the Island Parcel as a result of the taking; and (4) the comparable sales analysis performed by each expert, including the adjustments they made (or lack thereof).

### A.  Standards for Decision

### 1.  Legal Standards

As discussed above, the Fifth Amendment to the United States Constitution prohibits the federal government from taking private property for public use without paying just compensation, and the Surface Transportation Board's issuance of the May 20, 2009 NITU effected a permanent taking of Technical College's property.

It is well settled that just compensation is measured by the fair market value of the property taken. Bauman v. Ross, 167 U.S. 548, 574 (1897). "Under this standard, the owner is entitled to receive what a willing buyer would pay in cash to a willing seller at the time of the taking." Kirby Forest Indus., Inc. v. United States, 467 U.S. 1, 10 (1984) (internal quotation marks omitted).

In Rails-to-Trails cases, the "measure of damages for just compensation must be the difference between the value of plaintiffs' land unencumbered by a railroad easement and the value of plaintiffs' land encumbered by a perpetual trail use easement subject to possible reactivation as a railroad." Raulerson v. United States, 99 Fed. Cl. 9, 12 (2011). However, courts have consistently found that railbanking is not a "relevant consideration of analysis" in Rails-to-Trails cases because the possibility is so remote. Ingram, 105 Fed. Cl. at 540-41 (collecting cases describing railbanking as "hypothetical," a "vague notion," "unlikely," "speculative," and "unrealistic"); accord Howard v. United States, 106 Fed. Cl. 343, 367 (2012) ("[T]here is no real prospect that the property owners will ever again have unencumbered use of their property.").

### 2.  Appraisal Standards

In determining the value of the property interests taken in a Rails-to-Trails case, courts generally examine evidence provided by expert appraisers. The approach that government appraisers must follow in opining on the value of land taken by the federal government is found in the Uniform Appraisal Standards for Federal Land Acquisitions ("Yellow Book"), which is published by the Interagency Land Acquisition Conference.[18]  Yellow Book 1.

> Appraisers must exercise sound judgment based on known pertinent facts and circumstances, and it is their responsibility to obtain knowledge of all pertinent facts and circumstances that can be acquired with diligent inquiry and search. They must then weigh and consider the relevant facts with good judgment and make their decision, entirely on their own, in a sound professional manner, completely unbiased by any consideration favoring either the owner or the government.

Id. at 111. Appraisers not employed by the government are not bound by the Yellow Book, Hardy v. United States, 141 Fed. Cl. 1, 32 (2018), but the appraisal standards described in the Yellow Book are consistent with appraisal industry standards, Yellow Book 7.

Acquisitions in Rails-to-Trails cases are "partial acquisitions"—i.e., those in which the federal government "acquires only part of a unitary holding . . . commonly referred to as the larger parcel." Id. at 47. In partial acquisitions, compensation is measured by the difference

---

[18]  Joint Exhibit 5 is a complete copy of the 2000 version of the Yellow Book, which was the most recent version as of the May 20, 2009 NITU. The Yellow Book was not updated again until 2016, after both experts had submitted their reports and testified during trial.

between "the market value of the whole property before the government's acquisition and the market value of the remainder property after the government's acquisition."  Id. at 50.  This approach is known as the "before and after rule," id., and is the "conventional method of valuation" used in Rails-to-Trails cases,[19] Rasmuson v. United States, 807 F.3d 1343, 1345 (Fed. Cir. 2015) (internal quotation marks omitted).  See also Yellow Book 51 ("[T]he before and after method of valuation in partial acquisitions is preferred.").  In the "after" condition, appraisers are to assume that the recreational trail is in place and has been fully constructed.  PX 1.A at 9; DX 3 at 13.  All claimed damages to the remainder property in the "after" condition must be supported by "strict proof of the loss of market value"—in other words, "severance damage should never be assumed merely because there has been a partial acquisition, but must always be fully supported" and "must not be based on speculation."  Yellow Book 49 (internal quotation marks omitted).  "[E]vidence in this respect must not be 'vague and speculative in character,' nor may testimony dealing with 'possibilities more or less remote' be considered."  Id.  However, "[w]hen the cost to cure is less than the severance damages if the cure were not undertaken, the cost to cure is the proper measure of damage."  Id. at 51.  Appraisals properly utilizing the before-and-after method of valuation "automatically include[] the value of the land actually acquired as well as any severance damages and/or special benefits to the remainder property." Id. at 51.

The Yellow Book standards for "[a]ppraisal preparation, documentation and reporting" are "compatible with standards and practices of both the appraisal industry and the Uniform Standards of Professional Appraisal Practice (USPAP)."[20]  Id. at 7.  To that end, the Yellow Book contains a checklist of the required report content and documentation, a discussion of each item therein, and a recommended format for appraisal reports.  Id. at 8; see also id. at 113-16 (checklist).  The recommended format is to divide the report into seven parts (each with several subparts):  introduction, factual data regarding the "before" condition, data analysis and conclusions regarding the "before" condition, factual data regarding the "after" condition, data analysis and conclusions regarding the "after" condition, acquisition analysis, and exhibits and addenda.[21]  Id. at 117-18.

---

[19]  The "before and after rule" is also known as the "federal rule."  Yellow Book 50 n.227.

[20]  The Yellow Book standards recognize that appraisers "may sometimes encounter unique appraisal problems that require modification of the appraisal process and the appraisal report to ensure that the specific appraisal problem is adequately addressed and that the appraiser's final conclusion of value is accurate, and has been developed in accordance with controlling federal law."  Yellow Book 7.

[21]  When multiple properties are acquired simultaneously, a "project appraisal report" may be used to satisfy USPAP requirements.  Yellow Book 103.  A project appraisal report "include[s] the appraisal of more than one parcel in a single report."  Id.  Such reports "are not appraisal shortcuts; they are clerical shortcuts."  Id.  Project appraisal reports are commonplace in Rails-to-Trails cases.  However, due to Technical College being the sole plaintiff in this case, neither Mr. Matthews nor Mr. Batson utilized a project appraisal report.

Regardless of the specific format of the appraisal report, an appraiser's task is ultimately to "estimate the value of the land for its highest and best use, as if vacant and available for such use." Id. at 19; accord id. at 25. An appraiser may form such an estimate using the cost approach, sales comparison approach, or income capitalization approach. Id. at 19-23. The sales comparison approach is "the most reliable approach to value" and thus "is normally the best evidence." Id. at 37.

## B. The Larger Parcel

The first major area of dispute between the experts concerns the specific parcels to be analyzed. In other words, the experts used different properties as the larger parcel. Mr. Matthews performed two separate appraisals: (1) Main Campus, excluding parcels 105, 127, and 163A; and (2) the Island Parcel. PX 1.A at 23-26, 30. Meanwhile, Mr. Batson treated parcel 102 and the Island Parcel combined as the larger parcel, and appraised only that property. DX 3 at 15.

Appraisers "must make a larger parcel determination in every appraisal conducted under [Yellow Book] Standards." Yellow Book 17. The Yellow Book defines "larger parcel" as follows:

> The larger parcel, for purposes of these Standards, is defined as that tract, or those tracts, of land which possess a unity of ownership and have the same, or an integrated, highest and best use. Elements of consideration by the appraiser in making a determination in this regard are contiguity, or proximity, as it bears on the highest and best use of the property, unity of ownership, and unity of highest and best use.

Id.

## 1. Contiguity

The first element of consideration in determining the larger parcel is contiguity. Two or more parcels of land are contiguous if they are "[t]ouching at a point or along a boundary"—such parcels are also said to be "adjoining." Contiguous, Black's Law Dictionary, supra n.12; see also Adjoining, id. ("Touching; sharing a common boundary; contiguous."). Literal contiguity of multiple parcels "is not essential," but appraisers must nevertheless consider "physical proximity . . . to the extent that it bears on the physical and economic practicalities of a single unitary highest and best use." Yellow Book 48; accord id. at 47 n.203; see also id. at 18 ("[I]t is possible that two physically separate tracts may constitute a single larger parcel, or conversely, a single physical tract may constitute multiple larger parcels.").

All parcels constituting Main Campus are literally contiguous to one another. The fact that Ribaut Road lies between West Campus and East Campus is of no moment because the same portion of the road is a "common boundary" of West Campus and East Campus. See, e.g., Brace v. United States, 72 Fed. Cl. 337, 339, 340 (2006) (showing one larger parcel separated into three

contiguous sub-parcels by two roads).  Further, there is an underground tunnel connecting West Campus and East Campus.  Meanwhile, the Island Parcel is not literally contiguous to West Campus because it is separated by marshland, but it is proximate since it is only a short distance away.

In South Carolina, it is irrelevant whether two or more parcels are contiguous versus proximate because "the term 'contiguous' has been broadly interpreted" by its courts.  Eldridge v. S.C. Dep't of Transp., 683 S.E.2d 483, 485 (S.C. 2009) ("Eldridge II").

> Contiguity is not established by a road, waterway, right-of-way, easement, railroad track, marshland, or utility line which connects one property to another; however, if the connecting road, waterway, easement, railroad track, marshland, or utility line intervenes between two properties, which but for the intervening connector would be adjacent and share a continuous border, the intervening connector does not destroy contiguity.

Id. (quoting S.C. Code Ann. § 5-3-305).  Here, the approaches espoused by the Yellow Book and the South Carolina Supreme Court yield the same result.  There is no conflict between the two.  West Campus, East Campus, and the Island Parcel all satisfy the "contiguity or proximity" prong of the larger-parcel analysis to the extent that they have the same highest and best use.

### 2. Unity of Ownership

The second element of consideration in determining the larger parcel is unity of ownership.  In analyzing unity of ownership, "it is allowable to consider all lands that are under the beneficial control of a single individual or entity, even though title is not identical in all areas of the tract(s)."  Yellow Book 18.  Indeed, "some courts have found a single larger parcel even though the quality of the title was not identical."  Id. at 48.  In such instances, "legal control over the ownership and future of the lands in question was required to meet the unity of title test."  Id.

As stated above, Technical College owned West Campus, East Campus, and the Island Parcel as of May 20, 2009 (with the exception of parcels 105 and 127, which it acquired later).  Thus, these properties satisfy the "unity of ownership" prong of the larger-parcel analysis.[22]

### 3. Highest and Best Use

The final element of consideration in determining the larger parcel is unity of highest and best use.  "[T]o meet this test the lands in question merely have to have the same, or an integrated, highest and best use" when considering the "physical and economic practicalities."

---

[22]  Mr. Matthews excluded parcel 163A from his designation of the larger parcel because it is titled to Beaufort Technical College, which he incorrectly describes as a "different owner," PX 1.A at 12, rather than Technical College's prior name.  However, because parcel 163A is properly excluded on another basis, see infra Section III.B.3.b, such error is harmless.

Id.  The Yellow Book defines a parcel's highest and best use as "[t]he highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future."  Id. at 34 (quoting Olson v. United States, 292 U.S. 246, 255 (1934)).  In federal land acquisitions, there is a presumption that "the existing use of land is its highest and best use."  Id.  That presumption can be overcome by showing a "reasonable probability that the land is both physically adaptable for such [proposed alternative] use and that there is a need or demand for such use in the reasonably near future."  Id. at 34-35.  In other words, "each potential use must be analyzed in terms of its physical possibility, legal permissibility, financial feasibility, and its degree of profitability.  That use which meets the first three tests and is the most profitable use (i.e., results in the highest value) is the property's highest and best use."  Id. at 36. If "[v]arious parts of a single property . . . have different highest and best uses," those differences factor into determining the larger parcel.[23]  Id. at 35.

Mr. Batson avers that the "entire campus" is a singular "contiguous property" with "an integrated highest and best use" that is "under common ownership."  DX 3 at 15.  However, he only appraised parcel 102 and the Island Parcel because (1) "there are no enhancements or damages issues" to the remaining portions of campus and (2) "valuation of the entire development would be very complicated, involves multiple valuation methods, and includes a large number of variables without necessarily improving the quality of the appraisal or the reliability of the valuation."  Id.  According to Mr. Batson, focusing solely on parcels 102 and the Island Parcel "actually makes the [appraisal] clearer and more supportable without affecting the reliability of the results."  Id.  He reasons that "single-family development uses are the maximally productive use of the property," and further reasons that because single-family development is also legally permissible, physically possible, and financially feasible, it is the highest and best use.  Id. at 43.

Mr. Matthews posits that "[t]he highest and best use of the property as vacant land would be for either a college or an alternative use such as mixed use development including single family homes, multi-family apartments, condominiums, and recreational facilities required for the successful development of these uses."  PX 1.A at 29.  He explains that such use for Main Campus is permissible either under existing zoning or "under a rezone" for a planned unit development.  Id.  He also explains that the Island Parcel is only zoned for single-family residential development, but "considering that the adjacent property is a successful condominium project, it is only reasonable that this east half of the island could also be rezoned to allow for a similar residential condo project or a use in connection with the college for classrooms or student housing."  Id.  In addition, Mr. Matthews observes that, aside from federal land, Main Campus "may be the largest single contiguous land ownership" in Beaufort County and, as such, "would be attractive, from a physical point of view, for a large residential development" of various types. Id. at 27.

---

[23]  A piece of property could, for example, have a highest and best use of "residential or commercial along road or highway frontage and agricultural use for rear land."  Yellow Book 35. In such a scenario, the entire property would typically not be included in the "larger parcel" determination.  See id.

### a. Physically Possible

The experts do not disagree concerning the physical characteristics of any portion of Main Campus or the Island Parcel as of May 20, 2009.  Mr. Batson acknowledges that both Main Campus and the Island Parcel have "potential for subdivision into small lots," "[a]ll utilities are available," and "a combination of single-family and multifamily uses is physically permissible."  DX 3 at 42.  Mr. Matthews maintains that Main Campus "is adequate in location, access, utilities and topography for multiple uses of apartments, condominiums, houses, a college, park, etc.," PX 1.A at 27, and that the Island Parcel is similarly "adequate in size, shape, access, topography and water frontage for single family residential, multi-family residential, residential condominiums, college campus expansion, city park, etc.," id. at 28.

### b. Legally Permissible

The experts agree that Main Campus is zoned for both single- and multi-family development and that the Island Parcel is zoned only for single-family development.  However, Mr. Matthews believes that rezoning of the Island Parcel is reasonably likely, id. at 29, whereas Mr. Batson states that such rezoning is "Not Likely," DX 3 at 30.

Mr. Batson provides no support for his statement that rezoning of the Island Parcel is not likely, but none is required since he is not suggesting an alternative use from that already provided for under the applicable zoning laws.  Meanwhile, Mr. Matthews provides at least minimal support for his assertions concerning rezoning.  His explanation that the Island Parcel is reasonably likely to be rezoned to allow for multi-family development based on the adjoining use—which adjoining use is undisputed—satisfies the Yellow Book requirement of showing a "reasonable probability" that the Island Parcel is both physically adaptable for the alternative use and that there is a need or demand for such use.  In any event, Mr. Batson's acknowledgement that the Main Campus and the Island Parcel are located in "complementary [zoning] districts that could be developed with similar or integrated uses," id. at 14 (emphasis added), renders the difference in their zoning designations immaterial.

The experts agree that parcel 163A is zoned for medical use.  Thus, as Mr. Batson remarks, it is "not compatible with an integrated use" with the rest of the Technical College campus.  Id.  As such, it cannot be included in the larger parcel.

### c. Financially Feasible

The experts purport to disagree with respect to the financial feasibility of hypothetical developments of Technical College's land.  Mr. Batson asserts:

> Based on the limited development activity in 2009-2010, it appears that single-family development or subdivision of a larger scale would not be financially feasible.  It is also important to note that financing for such projects in 2009 would have been nearly impossible to obtain even for a qualified developer/investor . . . .

Id. at 42 (emphasis added).  However, he qualifies his assertion:

> [T]he unique location and size of the tract would imply some
> marketability and appeal even in a down market cycle.
>
> . . .  [T]racts may have been attractive for a "land bank"
> scenario involving a purchase for later development once recovery
> was well established in the end uses.
>
> The most likely purchaser as of mid-2009 would have been
> a local builder/investor.  There is a limited inventory of larger
> residential tracts, a mitigating factor to the weak demand and
> market preference of small number of lots.

Id. at 42-43; accord id. at 35 ("As configured as of the date of valuation, the larger parcel has good functional utility and development potential.").  Meanwhile, Mr. Matthews contends that "[t]he market began to slow in 2008 but homes and land continued to sell at an adequate pace into 2009 up to the approximate date of valuation." PX 1.A at 28.  He also remarks that "[d]emand for the Island Parcel for residential development would be good based on the successful adjacent residential condos and lack of development land in this area." Id. at 29.

Based on Mr. Batson's qualification of his assertions regarding financial feasibility, the experts appear to ultimately agree that the financial feasibility of both single- and multi-family development would be challenging but not impossible.  Indeed, Mr. Batson suggests that single-family development is financially feasible, DX 3 at 43, and draws no significant distinction between the financial feasibility of single- and multi-family development, see id. at 42.  Thus, the financial feasibility test supports either use.

### d.  Profitability

Neither expert provided more than a cursory analysis of the profitability of any potential use of Technical College's land.  Mr. Batson simply states that "no use of the site would be as profitable as single-family development uses" based on "all reasonably probable development scenarios and potential values that could be created versus the cost of development for each." Id. at 43.  Meanwhile, in addition to his arguments concerning demand, Mr. Matthews discusses a "common problem" that "[u]rban developments" often face:  the lack of vacant land available for expansion. PX 1.A at 28.  He implicitly considers profitability in concluding that the highest and best use for both Main Campus and the Island Parcel is a mix of single- and multi-family development.  See id. at 29.  Thus, because neither expert adequately supported his profitability reasoning, this aspect does not tilt in either direction.

### 4.  Analysis

The court concludes that the highest and best use of Technical College's land—both for Main Campus and the Island Parcel—if vacant and available for such use, is a combination of single- and multi-family development, rather than single-family development alone.  Both uses

are physically possible, legally permissible, and approximately equally financially feasible. Further, all else being equal, the definitions of the various zoning designations demonstrate that a combination of single- and multi-family development (i.e., "GR—General Residential") has a greater profit potential than single-family development alone (i.e., "R2—Residential"). However, parcel 163A is excepted because its highest and best use is medical, which is an incompatible use.

Because the entire Main Campus is contiguous, has unity of ownership as of the date of the NITU, and has the same highest and best use, it should all be analyzed as one larger parcel. Mr. Batson's reticence to analyze it as such despite his acknowledgment that "the entire campus is clearly an integrated highest and best use and is under common ownership,"[24] DX 3 at 15, and his internal inconsistency with respect to financial feasibility,[25] undermine the persuasiveness of his opinion.

The Island Parcel also has unity of ownership and the same (or at a minimum, an integrated) highest and best use vis-à-vis Main Campus.  In addition, it meets the contiguity-or-proximity test because it is physically proximate to Main Campus and has the same (or an integrated) highest and best use.  However, because of the need for rezoning to have the same (rather than integrated) highest and best use, its physical location (both in terms of adjoining

---

[24] Mr. Batson surmises that the Island Parcel "would be combined with uses to the north that are under the same ownership" and thus he combined it with parcel 102 to form his larger parcel.  Tr. 219 (Batson); accord id. at 317.  However, Mr. Batson does not apply the same standards—contiguity or proximity, unity of ownership, and unity of highest and best use—to the remainder of Main Campus beyond parcel 102.  In addition, although Mr. Batson agreed with Technical College's counsel's statement that the Island Parcel "does not meet the test of larger parcel under the Yellow Book because it is not contiguous," id. at 316, he explains that the Island Parcel "certainly needed to be included in the larger parcel" because "[p]art of the railroad adjoined it," id. at 219.  Indeed, Mr. Batson stated that whether a parcel "had the abandoned rail line adjoining its western portion" was a "test [he] developed as to determining whether or not a parcel should be included as part of the larger parcel."  Id. at 317.  Thus, he appears to conflate the contiguity standard with adjacency to the railroad.  Although those concepts can sometimes overlap, they are not the same.

[25] Mr. Batson also improperly applies certain valuation standards to his highest-and-best-use analysis.  For example, he incorrectly asserts that "other considerations in determining the larger parcel are the benefits (enhancements) and damages to the larger parcel."  DX 3 at 14. While benefits and damages to the remainder are important considerations in reaching an opinion regarding valuation, they are not relevant to determining the larger parcel except to the extent that they impact physical possibility, legal permissibility, financial feasibility, or profitability. Because Mr. Batson does not make that distinction, it is unclear whether he has a flawed understanding of the standards pertaining to the larger-parcel determination or simply did not effectively articulate a correct understanding.  However, because he concludes that "there are no damages or enhancements" to parcel 102 or the Island Parcel, id. at 15, his assertion that benefits and damages are relevant to determining the larger parcel is ultimately immaterial.

development and separation from Main Campus via marshland), and the uncertainty regarding access, see infra Section III.D, the more prudent course is to appraise the Island Parcel separately from Main Campus.

As of the May 20, 2009 NITU, Main Campus consisted of the following parcels:  102, 128, 129, 132, 132A, 133, 163A, and 190; the larger parcel includes each of these parcels except parcel 163A, which is zoned for medical use.  The size of the Main Campus larger parcel as of that date was 27.28 acres exclusive of the rail corridor, plus 0.55 acres for the portion underlying the rail corridor, for a total of 27.83 acres.[26]  The Island Parcel was 2.74 acres exclusive of the rail corridor, plus 0.91 acres for the portion underlying the rail corridor, for a total of 3.65 acres.

### C. The Deed Restriction

The second major area of dispute between the parties concerns the import of the restriction in the 1968 Baptist Society deed limiting the use of Technical College's land to educational purposes.  According to that restriction, parcels 102 and 128 in West Campus, parcel 190 (i.e., East Campus), and the Island Parcel automatically revert to the Baptist Society if they cease to be used for "educational purposes without discrimination on the basis of race, color, creed or national origin and for no other purpose."[27]  JX 1 at 2.

Mr. Batson frames the deed restriction as a "marketability" issue.  Tr. 222 (Batson).  He avers that Technical College "can't sell the property . . . without it reverting to the [Baptist Society]."  Id. at 223.  Thus, according to Mr. Batson, Technical College "does not have a marketable interest because they can't sell unless they go away.  If they go away, it reverts to the church."  Id. at 224.  Therefore, the land value to Technical College "is zero because it's not marketable."  Id.  Nevertheless, he appraised the property as if unencumbered by the deed restriction because the land could theoretically be sold and then the proceeds later divided up.  Id. at 226.

> As encumbered by the deed restriction and reverter clause, the marketability of the larger parcel is essentially unchanged.  The only difference is by whom the property would be marketed. . . . The reverter clause will not prevent the larger parcel from achieving its highest and best use "as vacant[."]  It simply adds a step to the marketing process in the conveyance from [Technical College] to [the Baptist Society].

---

[26]  The total acreage is rounded only to the nearest hundredth (i.e., two decimal places) because some of the lot sizes available lack further precision.

[27]  The Baptist Society's reversionary interest is subordinate to any mortgage or deed of trust to the extent that the proceeds thereof are used to improve the premises.  JX 1 at 2.  To that end, by the express terms of the 1968 deed, a judicial foreclosure or other sale to satisfy such a lien extinguishes the Baptist Society's interest.  Id.  Neither party addressed this possibility.  Accordingly, the court considers this possibility sufficiently remote to be immaterial.

DX 3 at 40.  In other words, in Mr. Batson's view, the deed restriction does not impact the market value of the property; it only impacts entitlement to the proceeds.  See Tr. 266 (Batson) ("It's not a question [regarding] what the value is; it's more a question of who gets just compensation or the value of the property."), 367 ("[T]he only way to value this property is to assume that it has no restriction, that the entire bundle of rights exists and that it can be developed to its highest and best use.").

Mr. Matthews agrees, albeit for different reasons, that a proper appraisal must "in effect ignor[e] the deed restriction." Id. at 119 (Matthews).  According to Mr. Matthews, he "cannot consider the deed restriction because it separates out multiple interests in the property" and he must "appraise the whole." Id. at 120.  He explains that in any event, "the value is the same" whether he appraises Main Campus and the Island Parcel "as a university or college, technical school or apprais[s] it for alternative, single-family, multi-family residential uses." Id. at 120-21.  He reasons that an entity purchasing land for educational purposes would pay the same price as an entity purchasing land for its highest and best use—here, residential development. Id. at 117-18, 121.

The deed restriction creates two interests in the relevant parcels:  (1) a present possessory estate, i.e., the fee simple determinable held by Technical College; and (2) a future interest, i.e., the possibility of reverter held by the Baptist Society.  This separation of interests invokes what is described in the Yellow Book as the "unit rule." See Yellow Book 53-55.  "The market value concept adopted by the courts to be applied in federal acquisitions generally requires" its application. Id. at 53.

> [T]he unit rule requires that property be valued as a whole rather than by the sum of the values of the various interests into which it may have been carved . . . .  [I]f there are several interests or estates in the property, the property should be valued as a whole, embracing all of the rights, estates, and interests of all who may claim, and as if in one ownership.  The market value of the whole property is later apportioned among those who hold various interests in the property, but this apportionment generally falls outside the scope of the government appraiser's assignment.

Id.

Proper application of the unit rule thus requires Main Campus and the Island Parcel to be valued according to their highest and best uses without regard to the deed restriction; on this point, the experts agree.  However, the experts disagree with respect to whether Technical College or the Baptist Society is entitled to the proceeds.

Mr. Batson contends that the Baptist Society is entitled to the entire proceeds of a hypothetical sale and therefore the Baptist Society "gets the award of whatever [just compensation] may be under the reverter clause." Tr. 266 (Batson).  This assertion reflects a fundamental misunderstanding of the deed restriction itself.  The deed restriction prevents the land in question from being used for other than educational purposes; it does not prevent

Technical College or its successor from transferring the land.  Indeed, the Baptist Society conveyed the land not only to the State but also to the State's "successors and assigns forever," subject to the deed restriction.  JX 1 at 2.  In other words, it is the use—not the transfer—of the land that is the determinable event.  Technical College could, for example, transfer a portion of the land to the Beaufort County School District or a private entity to be used as an elementary school without running afoul of the deed restriction.  Its successor would then be responsible using the property for educational purposes to prevent the Baptist Society from realizing its future interest.

The division of the proceeds between Technical College and the Baptist Society is, according to the unit rule, not a factor in determining the value of the land taken.  Further, it is well settled that the Court of Federal Claims "does not have subject matter jurisdiction to entertain controversies between private parties."  Hufford v. United States, 85 Fed. Cl. 607, 608 (2009).  However, the Baptist Society has not appeared in this case, and Technical College has not demonstrated that it is entitled to recover damages representing compensation for the Baptist Society's interest that was taken.  Thus, the court must consider the hypothetical division of proceeds not to resolve a dispute between Technical College and the Baptist Society, but as an aspect of determining the amount of just compensation to which Technical College is entitled.

Mr. Matthews argues that "the value of [the Baptist Society's] reverter clause is probably 1 or 2 percent of the value of the property if you discount it properly."  Tr. 167 (Matthews); accord id. at 119-20.  Mr. Batson "agree[s] with Mr. Matthews" on this point, describes the Baptist Society's future interest as a "minor reversionary right that . . . they can't exercise," and explains that the value of that interest "is negligible because it's essentially . . . at some point very distant in the future."  Id. at 367 (Batson).

Accordingly, the court concludes that the proper approach is to (1) value both the Main Campus and the Island Parcel according to their highest and best uses without regard to the deed restriction, and (2) adjust both the "before" and "after" values to reflect a 2% discount with respect to the land that Technical College acquired from the Baptist Society.[28]  The areas of Main Campus and the Island Parcel in the "before" and "after" conditions are as follows:

> Main Campus
> - Before:  27.83 acres (24.86 acres subject to deed restriction)
> - After:  27.28 acres (24.31 acres subject to deed restriction)
> - Take:  0.55 acres (all subject to deed restriction)

---

[28]  Since the former rail corridor is adjacent to parcels 102 and the Island Parcel, both of which are subject to the deed restriction, the land underlying the former rail corridor must similarly be treated as if it is subject to the deed restriction based on the center-line presumption.

Island Parcel
- Before:  3.65 acres (all subject to deed restriction)
- After:  2.74 acres (all subject to deed restriction)
- Take:  0.91 acres (all subject to deed restriction)

### D.  Access to the Island Parcel

The third major area of disagreement between the experts concerns severance damages—specifically, damages pertaining to access to the Island Parcel.  The experts agree that there were no special benefits to the Island Parcel, and no special benefits or severance damages to Main Campus, resulting from imposition of the perpetual trail use easement.  PX 1.A at 45; DX 3 at 63.

Mr. Batson surmises that access to the Island Parcel "is limited and somewhat speculative both before and after" construction of the Spanish Moss Trail and thus the Island Parcel was neither damaged nor enhanced.  DX 3 at 63; accord DX 2 at 22 (describing the Island Parcel as having "essentially the same access before and after the acquisition").  Meanwhile, Mr. Matthews did not determine whether such access was lost as a result of the trail, PX 1.A at 38, and provided alternative opinions of value to account for either possibility, id. at 45.

It is well understood that the "accessibility of one's property may in some instances constitute a great part of its value, and to permit a material impairment of [the owner's] access would result in the destruction of a great part of the value of [the owner's] property."  Brown v. Hendricks, 45 S.E.2d 603, 606 (S.C. 1947).  As Mr. Matthews notes, access—or lack thereof—bears upon the highest and best use of land.  PX 1.A at 38-39.  There are two types of access to the Island Parcel that were potentially impacted by the imposed perpetual trail use easement: pedestrian access and vehicular access.  (Access via marshland was not impacted.)

### 1.  Pedestrian Access

In the hypothetical "before" condition without a public recreational trail, Technical College would have had pedestrian access to the Island Parcel via the former rail corridor because it would have owned that land in fee simple (the same interest it holds in abutting land, pursuant to the center-line presumption).

In the "after" condition where the trail has been fully constructed, Technical College has pedestrian access to the Island Parcel via the Spanish Moss Trail—i.e., the same land underlying the former rail corridor—because the trail is open to the public and is accessible both via public roads and the Technical College campus.  This conclusion is supported by aerial photographs, e.g., JX 4.B; DX 2 at 20; photographs on the ground showing access to the Island Parcel via the trail from Main Campus, Allison Road near Cottage Farm Drive, and Rising Tide Drive, e.g., PX 1.A at 8-9; DX 2 at 22; DX 3 at 37; Mr. Matthews's descriptions of photographs, including his ability to access the trail and the Island Parcel via foot, Tr. 100-01 (Matthews); Mr. Wiser's observation that students can use the trail, id. at 37 (Wiser); and Mr. Matthews's statement that "[a]dditional access is from the trail," PX 1.A at 38.  In addition, Mr. Wiser acknowledged that

Technical College has not lost its ability to build pedestrian-only walkways or bridges across the marshland from West Campus to the Island Parcel pursuant to its master plan.  Tr. 42-44 (Wiser).

Therefore, the Island Parcel suffered no loss of pedestrian access as a result of the imposition of the trail.

## 2.  Vehicular Access

Unlike the issue of pedestrian access to the Island Parcel, the issue of vehicular access is more nuanced.  As explained above, Rising Tide Drive extends to the northwest corner of the Island Parcel on the opposite side of the Spanish Moss Trail.  The nature of the Technical College's access to the Island Parcel depends upon (1) the import of Rising Tide Drive's status as a private road and (2) whether the Technical College has crossing rights over the Spanish Moss Trail.

During trial, Mr. Matthews explained that Rising Tide Drive existed prior to the Rising Tide Condominiums complex and that "[t]he condo development improved the road."  Id. at 150 (Matthews).  He noted that the road improvement took place before the May 20, 2009 NITU.  Id. at 184.  He further explained that Rising Tide Drive's status as a private road concerns "primarily who maintains it" and thus "there's really no restriction getting to the [Island Parcel] using that road."  Id.  Mr. Matthews's photographs demonstrate that he was able to drive along Rising Tide Drive without constraint.  Id. at 100-01; PX 1.A at 8-9.  Further, he answered in the affirmative when asked if Technical College "had access by and through Rising Tide [Drive] to the island parcel" prior to May 20, 2009.  Id. at 184.  Mr. Wiser agreed that Technical College "had vehicular access to the island" (i.e., the entire island, which contains both the Rising Tide Condominiums and the Island Parcel) prior to the development of the Rising Tide Condominiums.  Id. at 40 (Wiser).  He noted, however, that Rising Tide Drive "did not extend all the way to" the Island Parcel.  Id. at 40-41.

In South Carolina, "publicly maintained" roads include streets and highways, and are "open to the use of the public for purposes of vehicular travel."  S.C. Code Ann. § 56-5-430.  Meanwhile, the General Assembly defines a "private road" as "[e]very way or place in private ownership and used for vehicular travel by the owner and those having express or implied permission from the owner but not by other persons."  Id. § 56-5-450.  In other words, a private road is "restricted from public use."  Karen Gantt, Natural Disasters and Private Road Residents: When "And I'm a Taxpayer" Isn't Enough, 42 Real Est. L.J. 434, 435 (2014) (citing S.C. Code Ann. § 56-5-450).  By definition, the use of a private road by those without express or implied permission of the owner (e.g., a trespasser) does not transform the road into a public road.  Owners of private roads in South Carolina have considerable discretion over their roads, such as determining whether the Uniform Act Regulating Traffic on Highways applies only partially or in its entirety, see State v. Allen, 431 S.E.2d 563, 564 (S.C. 1993) (citing S.C. Code Ann. §§ 56-5-6310, -6330), and setting speed limits, S.C. Code Ann. § 56-5-6310.[29]

---

[29]   The Uniform Act on Regulating Traffic on Highways is located at title 56, chapter 5 of the South Carolina Code.

Since Rising Tide Drive is a private road, its owner—perhaps the Rising Tide Condominiums—has the right to prevent anyone from using the road without its "express or implied permission." For example, the General Assembly has specified that certain filings do not "constitute permission by the owner for the public to use [private] roads." Id.; accord McAllister v. Smiley, 389 S.E.2d 857, 861 (S.C. 1990) (Toal, J., dissenting) ("Dedication of a private road for public use is evidenced by an intent by the landowner to dedicate the land and an express or implied acceptance."). Based on the statements of both Mr. Matthews and Mr. Wiser, it appears that Technical College has such permission, in some form or another, to use Rising Tide Drive.[30] In any event, Technical College has not provided any evidence to suggest that the nature of its ability to use Rising Tide Drive has changed (if at all) as a result of the NITU, rather than by other forces.

Because Rising Tide Drive terminates on the other side of the Spanish Moss Trail from the northwest corner of the Island Parcel, the pertinent issue thus becomes the nature of Technical College's crossing rights, if any. The Surface Transportation Board "has recognized that not all state law claims are pre-empted by the Trails Act." Dana R. Hodges Tr. v. United States, 111 Fed. Cl. 452, 457 (2013). Specifically, "[r]outine non-conflicting uses, such as non-exclusive easements for at-grade crossings, are not preempted." Id. (internal quotation marks omitted). The Hodges decision thus stands for the proposition that landowners "are not impeded from exercising whatever rights of access they held that pre-existed the conversion of the railroad corridor to recreational usage." James, 130 Fed. Cl. at 734. In other words,

> [t]here is no support in South Carolina case law or in the Trails Act for [Technical College's] argument that, by operation of the Trails Act, [Technical College] lost [its] crossing rights when the NITU was issued. [Technical College's] crossing rights have not changed. Instead, [Technical College] hold[s] the same crossing rights over the trail use and railbanking easements imposed by the NITU . . . that [Technical College] held when [the Port Royal Railroad Company] received the easements for railroad purposes over [Technical College's] land.

Id.

Therefore, the court concludes that the Island Parcel suffered no loss of vehicular access as a result of the trail. Technical College still has whatever access rights (if any) to the Island Parcel that it held prior to the NITU. Accordingly, severance damages for loss of access are inappropriate, and the court need not address the sufficiency of Mr. Matthews's cost-to-cure

---

[30] If Technical College had no such permission, the issue of access would be moot because its access to the Island Parcel would have been cut off (if at all) when the road was developed, which was before the Surface Transportation Board issued the NITU. In that scenario, although the highest-and-best use analysis as of May 20, 2009, with respect to the Island Parcel would change, Technical College's remedy (if any) for loss of access would be in a state court action against the owner of the road.

calculations.  Nevertheless, because access impacts the highest and best use determination, the court must still consider whether Technical College had any such rights.

In South Carolina, vehicular access to a railroad right-of-way is generally not allowed; the exceptions relevant here are "authority from the railroad which owns the right of way" and "using a public or private roadway which crosses over the railroad at an established grade crossing."  S.C. Code Ann. § 58-17-4095.  There is no evidence to suggest that Rising Tide Drive has ever extended across the former rail corridor into the Island Parcel.  Nor is there any evidence in the record of "actual crossing easements or agreements" constituting authority to cross the rail line when the line was operational.  Tr. 227 (Batson).

However, South Carolina law allows local authorities to "lay out a [public road] across a railroad in such manner as not to injure or obstruct the railroad" if the "governing body of the county adjude[s] that the public convenience and necessity require" such a crossing.  S.C. Code Ann. § 58-17-1360.  In other words, Technical College could have petitioned the Beaufort County Council to authorize a public road across the rail corridor to extend Rising Tide Drive to the Island Parcel.[31]  Indeed, Mr. Wiser previously contacted local authorities regarding the possibility of extending Rising Tide Drive to the Island Parcel; he was informed that other than the "normal permitting and application process" there were no "major impediments" to doing so.  Tr. 27-28 (Wiser).  Presumably, Technical College could still petition for a crossing under section 58-17-1360 of the South Carolina Code—there is no evidence to suggest otherwise.[32]  Technical College could also potentially use the power of eminent domain to acquire an easement to cross the Spanish Moss Trail where it meets Rising Tide Drive.  Therefore, Technical College was not meaningfully prevented from accessing the Island Parcel prior to the NITU, and the highest and best use of the Island Parcel is not impacted by any access issues.

### E.  Comparable Sales Analysis

The final major area of dispute between the experts concerns the valuation approach used by the experts.  Of the three approaches available for appraisers to use in estimating property values, both experts utilized the sales comparison approach.  PX 1.A at 29-30; DX 3 at 2.

---

[31]  Since Technical College is a public entity, a matter of "convenience" or "necessity" with respect to Technical College would be a matter of "public convenience" or "public necessity" for purposes of section 58-17-1360 of the South Carolina Code.

[32]  As noted above, the Trails Act specifically provides that interim use of a former rail corridor as a public recreational trail "shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes."  16 U.S.C. § 1247(d).  Accordingly, the Spanish Moss Trail is still considered a railroad right-of-way for purposes of South Carolina law.

### 1.  Description of the Sales Comparison Approach

The Yellow Book contains a description of the sales comparison approach and its applicable standards:

> Arms length transactions in lands in the vicinity of and comparable to the land under appraisement, reasonably near the time of the acquisition in question, are the best evidence of market value, but not to the extent of exclusion of other relevant evidence of value.  Such transactions are commonly referred to as comparable sales, and the process of forming an opinion of the property's market value through comparison of such sales transactions with the subject property is known as the sales comparison approach to value.  . . .

> Comparison of sales transactions to the subject property being appraised is the essence of the sales comparison approach to value.  The basic elements of comparison to be considered are recognized as:

> - Property rights conveyed
> - Financing terms
> - Conditions of sale
> - Market conditions (historically referred to as a time or date of sale adjustment)
> - Location
> - Physical characteristics
> - Economic characteristics
> - Use and zoning
> - Non-realty components of value included in the sale property

Yellow Book 37 (first and second emphases added) (footnotes omitted).  With respect to the timing of comparable sales,

> [s]ales transacted on or before the date of acquisition are the preferred support for an appraisal and if such sales are available and adequate, there is little justification for using post-acquisition sales.  Use of post-acquisition sales should be avoided where they reflect artificially inflated or depressed values resulting from the acquisition itself or from the government's project, or if they significantly post-date the acquisition date.

Id. at 39 (footnote omitted).  Further guidance with respect to selecting comparable sales provides that "[t]he consideration and weight accorded to sales of other lands is determined by the reliability of the data collected and verified and by the application of the three tests of proximity (in time, in location, and in physical and economic similarity)."  Id. at 40.  In addition,

> [t]he preferred method of adjusting comparable sales is
> through the use of quantitative adjustments whenever adequate
> market data exists to support them . . . .  Each item of adjustment
> must carefully be analyzed to determine whether a percentage or
> dollar adjustment is appropriate.
>
> . . . .
>
> In developing a final value estimate by the sales
> comparison approach, the appraiser shall explain the comparative
> weight given to each comparable sale, no matter whether
> quantitative or qualitative adjustments, or a combination thereof,
> are used.  A comparative adjustment chart, or graph, is
> recommended and may assist the appraiser in explaining his or her
> analysis in this regard.

Id. at 21.  In developing a final value estimate, "no consideration whatever should be given to
matters not affecting market value."  Id. at 30.

### 2. Mr. Batson's Comparable Sales

The court is compelled to reject Mr. Batson's comparable sales analysis and market value
conclusions in their entirety based on his fundamentally flawed construction of the larger parcel.
For instance, he acknowledges that East Campus has direct deep-water access, deep-water access
is a significant amenity in Beaufort County, and land with deep-water access will generally sell
for higher values (all else being equal), but he did not include East Campus as part of the larger
parcel because it was supposedly "not affected" by the imposition of the trail easement.  Tr.
310-11 (Batson); see, e.g., PX 1.B at 12 (aerial photograph of the entire Technical College
campus showing the deep-water access of East Campus and the marshland access of both West
Campus and the Island Parcel).  As Mr. Matthews explains,

> having the tunnel and [East Campus] contiguous across the street
> from [West Campus], if you were to build a campus or build
> housing and it was a community where you could allow people on
> the west side to go [through] the tunnel or walk across the road and
> go out on the pier, so you can put your boat out there and have
> deep water access, that enhances the value of the west side.
>
> . . . .
>
> . . . I looked at those sales and compared the sales of deep
> water and saltwater marsh and found that deep water is worth a lot
> more, but saltwater marsh is worth a lot more than just inland
> without the view.  . . .

> So the marsh view adds value; the deep water adds more
> value.  And because you have the access to the deep water, does
> that enhance the west side?  A little.

Tr. 197-98 (Matthews).  Because West Campus, standing alone, is less valuable than West
Campus when combined with East Campus, an approach (like Mr. Batson's) that summarily
dismisses that enhancement for the sake of convenience and simplicity is unreliable.  Further
analysis of the reliability of Mr. Batson's methodology is unnecessary.  See Ultimo v. Sec'y of
HHS, 28 Fed. Cl. 148, 152 (1993) ("Simply because a witness is found qualified to testify as an
expert does not mean that the trier of fact must accept [the witness's] testimony."); see also
Okerlund v. United States, 53 Fed. Cl. 341, 345 (2002) ("The Court may either accept the expert
opinion in its entirety, accept portions of the expert's opinion, or reject the opinion altogether
. . . .").

### 3.  Mr. Matthews's Comparable Sales

Of course, simply because the court rejects the defendant's expert's opinion in a
particular area does not mean that it must accept the plaintiff's expert's opinion.  Indeed, the
plaintiff bears the burden of proof in establishing both liability and the amount of compensation
that it is owed.[33]  Therefore, the court addresses the reliability and persuasiveness of Mr.
Matthews's comparable sales analysis.  As explained herein, the court finds his comparable sales
analysis to be both reliable and persuasive.

Mr. Matthews opines that, in the "before" condition, Main Campus is worth $9.00 per
square foot and the Island Parcel is worth $14.00 per square foot.  PX 1.A at 34.  Those values
are unchanged in the "after" condition.  Id. at 44.  With respect to Main Campus, Mr. Matthews
uses eight comparable sales.  PX 1.A at 31, 40.  He uses nine comparable sales to opine on the
value of the Island Parcel; some of these sales are the same comparable sales that he uses for
Main Campus.  Id. at 31-32 ("before"), 40-41 ("after").  All of the comparable sales that he
uses—whether for Main Campus, the Island Parcel, or both—occurred between June 21, 2006,
and August 27, 2008.  Id.  After identifying the comparable sales, Mr. Matthews adjusted each
sale to reflect the date of sale, location, size, waterfront access (deep water, marsh, or both),
shape and topography, and availability of utilities.  Id.  He explains the purpose of each type of
adjustment as follows:

> Adjustments were required to these sales to reflect the
> differences between the appraised property and the sale property.
>
> . . . .

---

[33]  Once a plaintiff meets its burden, the burden of persuasion shifts to the defendant.
Here, however, defendant fails to persuade the court that the federal government was not liable
for a Fifth Amendment taking or convince the court that its appraiser's damages analysis was
entitled to more weight.

> Time adjustments reflect the change in prices over time,
> due to appreciation, depreciation or inflationary factors. . . .
> Adjustments are made to the sales based on the appropriate pattern
> of change from the date of sale to the date of appraisal.  . . .
>
> Location adjustments reflect the quality of the location of
> the sale compared to the subject property.  Reputation, traffic,
> convenience, access, surrounding properties, etc., all affect the
> desirability of a site with the more desirable locations receiving
> greater demand resulting in higher prices.
>
> Size adjustments reflect the trend that parcels tend to sell
> for less per square foot or per acre as the parcel size increases.
>
> Shape and topography adjustments reflect the desirability
> of the physical characteristics of the land.  . . .
>
> No conditions of sale adjustments were required since all
> these sales were arms length . . . .  Unless noted otherwise, no
> financing adjustments were required since all sales were for cash to
> the seller or at conventional financing terms.

Id. at 33.

Mr. Matthews emphasizes that "[t]he size of the property explains over 40% of the variance in total price for the campus sales indicating that [dollars per square foot] should be used.  After adjustments, the range of [value per square foot] narrows and the standard deviation reduces substantially."  Id.  Mr. Matthews notes that "[t]he largest adjustment is for size since price/acre declines with a substantial increase in size," id., and remarks that the "standard trend" he has observed in "analyzing literally thousands of properties" regarding the "relationship between price per acre . . . and size of that parcel" essentially "flattens out" at approximately ten to twelve acres, Tr. 141 (Matthews).  He included his analysis in the addenda attached to his expert report.  PX 1.A at 33; see, e.g., PX 1.B at 62.

In addition to the size adjustments, Mr. Matthews adjusted for "deep water versus salt marsh," PX 1.A at 34, and he quantified those adjustments accordingly, see id. at 31-32 ("before"), 40-41 ("after").  He made smaller adjustments for neighborhood and time.  Id. at 31-32, 34, 40-41.  In his addenda, Mr. Matthews indicates:

> For appraisal purposes, the positive time adjustment for the
> earlier sales prior to 2008 is applied at 0.5% per month or 6.0%
> annually.  As the effect of time was impacting the sales in the
> earlier time spanning 2006-8, the market conditions from August
> 2008 through May 2009 are observed to have leveled off.  The
> negative time factor for post 2009 sales activity does not factor

into the analysis because there are no post dated sales to consider.[34]

PX 1.B at 50 (footnote added). He bases the 6.0% figure on "sales turnover where properties in the area have sold and resold since 1999," the changes in trends over the years, and two individual case studies of paired sales of the same properties in Beaufort. Id.

The court concludes that Mr. Matthews adequately supported his adjustments to the comparable sales, the selection of which appears reasonable in the first instance (based, in part, on the highest-and-best-use analysis discussed above). In addition, despite some deficiencies in organization and clarity within his expert report and addenda, Mr. Matthews performed his analysis in accordance with Yellow Book standards. Therefore, the court finds Mr. Matthews's analysis reliable and persuasive, and adopts his market value conclusions.

### F. Principal Amount of Just Compensation

Having made its findings and conclusions outlined above, the court must now calculate the amount of just compensation owed to Technical College by comparing the "before" and "after" values of both Main Campus and the Island Parcel.

In the "before" condition, Main Campus comprised 27.83 acres. Of these, 24.86 acres were subject to the deed restriction (and its concomitant 2% discount) and the remaining 2.97 acres were unrestricted. Thus, Main Campus was worth $10,715,551 in the "before" condition:

- Restricted: 24.86 acres × 43,560 square feet per acre × $9.00 per square foot × 98% = $9,551,192 (rounded to the nearest whole dollar)

- Unrestricted: 2.97 acres × 43,560 square feet per acre × $9.00 per square foot × 100% = $1,164,359 (rounded to the nearest whole dollar)

- Total: $9,551,192 + $1,164,359 = $10,715,551

In the "before" condition, the Island Parcel comprised 3.65 acres, all of which was subject to the deed restriction. Thus, the Island Parcel was worth $2,181,398 in the "before" condition:

---

[34] In his expert report, Mr. Matthews referred to the "effective appraisal date" as both March 20, 2009, and May 20, 2009. Compare, e.g., PX 1.A at 40, with id. at 41. The parties stipulated that "any reference to the date of March 20, 2009 . . . is incorrect," the result of "an oversight and/or a typo," and "has no material impact on the case." Stip. ¶ 2. Mr. Matthews's calculations appear in line with this stipulation. Accordingly, the court treats any reference to March 20, 2009, by Mr. Matthews in his expert report as a reference to May 20, 2009.

- Restricted:  3.65 × 43,560 square feet per acre × $14.00 per
  square foot × 98% = $2,181,398 (rounded to the nearest whole
  dollar)

- Unrestricted:  None

- Total:  $2,181,398 + $0 = $2,181,398

In the "after" condition, Main Campus comprised 27.28 acres.  Of these, 24.31 acres were subject to the deed restriction and the remaining 2.97 acres were unrestricted.  Thus, Main Campus was worth $10,504,242 in the "after" condition:

- Restricted:  24.31 acres × 43,560 square feet per acre × $9.00
  per square foot × 98% = $9,339,883 (rounded to the nearest
  whole dollar)

- Unrestricted:  2.97 acres × 43,560 square feet per acre × $9.00
  per square foot × 100% = $1,164,359 (rounded to the nearest
  whole dollar)

- Total:  $9,339,883 + $1,164,359 = $10,504,242

In the "after" condition, the Island Parcel comprised 2.74 acres, all of which was subject to the deed restriction.  Thus, the Island Parcel was worth $1,637,542 in the "after" condition:

- Restricted:  2.74 × 43,560 square feet per acre × $14.00 per
  square foot × 98% = $1,637,542 (rounded to the nearest whole
  dollar)

- Unrestricted:  None

- Total:  $1,637,542 + $0 = $1,637,542

When the values for Main Campus and the Island Parcel are added together, Technical College's land was worth $12,896,949 in the "before" condition and $12,141,784 in the "after" condition.  Therefore, the total diminution in value is $755,165.  This is the principal amount of just compensation owed to Technical College.  The entire amount is allocable to the market value of the land taken; none is allocable to severance damages.

### G.  Delay Damages

In addition to the principal amount of just compensation, "[i]t is now axiomatic that the Fifth Amendment's reference to 'just compensation' entitles the property owner to receive interest from the date of the taking to the date of payment as a part of [its] just compensation." Otay Mesa Prop., L.P. v. United States, 779 F.3d 1315, 1328 (Fed. Cir. 2015) (internal quotation marks omitted).  In other words, a prevailing plaintiff is entitled to delay damages in addition to

the principal value of the property taken.  The undersigned has previously observed, in an unrelated case, that "the consensus that has emerged since 2009 in the Court of Federal Claims [is] that the [Moody's Composite Index of Yields on Aaa Long Term Corporate Bonds ("Moody's")] rate is the appropriate benchmark by which to award delay damages in the Rails-to-Trails context."[35]  Hardy v. United States, 138 Fed. Cl. 344, 356 (2018).  Further, the court observes that the plaintiffs in four cases concerning the same NITU at issue here reached a stipulation with the federal government regarding the proper interest rate to be applied and the frequency at which interest is to be compounded.[36]

In the instant case, however, the parties have neither reached a stipulation regarding delay damages nor briefed the issue.  The court will not direct an entry of judgment for Technical College until that issue is resolved.  Pursuant to RCFC 42, separate proceedings, including trials, may be held for separate issues.  The court finds that determining delay damages (i.e., the appropriate interest rate and compounding frequency) is a separate issue from those decided above (i.e., liability and principal value).  Once the court resolves the delay damages issue, it will direct the entry of an RCFC 54(b) judgment for both the principal amount of just compensation owed to Technical College and delay damages.

### H.  Attorney Fees and Costs

The third and final component of just compensation is attorney fees and costs.  Section 304(c) of the Uniform Relocation Assistance and Real Property Acquisition Policies Act ("URA") provides:

> The court rendering a judgment for the plaintiff in a proceeding brought under [28 U.S.C. §§ 1346(a)(2) or 1491] awarding compensation for the taking of property by a Federal agency . . . shall determine and award or allow to such plaintiff, as a part of such judgment . . . , such sum as will in the opinion of the court . . . reimburse such plaintiff for [its] reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred because of such proceeding.

---

[35]  The Moody's rate for May 20, 2009, was 5.48%.  Federal Reserve Economic Data, Moody's Seasoned Aaa Corporate Bond Yield, Federal Reserve Bank of St. Louis, https://fred.stlouisfed.org/series/DAAA/ [http://web.archive.org/web/20190729190249/https://fred.stlouisfed.org/series/DAAA/].

[36]  Pickle Factory Condos, LLC v. United States, No. 13-42L (Fed. Cl. filed Jan. 17, 2013); Welcker v. United States, No.12-369L (Fed. Cl. filed June 8, 2012); Ingram v. United States, No. 10-463L (Fed. Cl. filed July 19, 2010); Raulerson v. United States, No. 10-193L (Fed. Cl. filed Mar. 31, 2010).

42 U.S.C. § 4654(c) (2012).  Therefore, as a prevailing plaintiff in this action, Technical College is automatically entitled to reimbursement of its reasonable attorney fees and costs pursuant to the URA.  Gregory v. United States, 110 Fed. Cl. 400, 403 (2013) (citing Bywaters v. United States, 670 F.3d 1221, 1228 (Fed. Cir. 2012)).

The issue of attorney fees and costs is a separate issue from those decided above.  In addition, it is a wholly separate issue from delay damages.  Other judges of this court have followed a similar approach, i.e., deciding attorney fees and costs after resolving liability and damages.  E.g., Bratcher v. United States, 136 Fed. Cl. 786, 791 (2018).

Under RCFC 54(d)(2)(B)(i), a motion for attorney fees must normally be filed within thirty days after the entry of final judgment; however, that rule allows the court to specify otherwise.  Accordingly, the court will entertain a motion for attorney fees and costs within thirty days of its judgment on liability and damages becoming nonappealable.

## IV.  CONCLUSION

The court has considered all of the parties' arguments.  To the extent not discussed herein, they are unpersuasive, meritless, or unnecessary for resolving the issues currently before the court.

Defendant is liable for effecting a taking of a portion of Technical College's property— land underlying a railroad easement held by the Ports Authority.  Technical College's claim accrued on May 20, 2009, the date that the Surface Transportation Board issued the NITU.  Absent the NITU, Technical College would have owned the land underlying the rail corridor unencumbered by any easement.  Accordingly, Technical College is entitled to $755,165 as the principal portion of just compensation for the taking of its property rights.

However, the court is not directing the entry of judgment at this time.  The issues of delay damages and attorney fees and costs are yet to be determined.  The parties shall confer and then, **no later than Tuesday, October 15, 2019**, file a joint status report suggesting a schedule for proceedings to determine delay damages.  The court will enter judgment under RCFC 54(b) after it resolves that issue.  The court will entertain a motion for attorney fees and costs after the RCFC 54(b) judgment becomes nonappealable.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Chief Judge