# In the United States Court of Federal Claims

No. 15-488L
(Filed: February 13, 2020)

```
*************************************
TECHNICAL COLLEGE OF THE LOW    *
COUNTRY,                        *
                                *
                 Plaintiff,     *
                                *
      v.                        *
                                *
THE UNITED STATES,              *
                                *
                 Defendant.     *
*************************************
```

Rails-to-Trails; Cross-Motions for Partial Summary Judgment; RCFC 56; RCFC 42; Just Compensation; Delay Damages; Appropriate Interest Rate; Prudent Investor Rule; Compound Interest

<u>Thomas S. Stewart</u>, Stewart Wald & McCulley LLC, Kansas City, MO, for plaintiff.

<u>Jessica M. Held</u>, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Chief Judge

In this Rails-to-Trails action, plaintiff Technical College of the Lowcountry ("Technical College") owns real property adjacent to a former rail corridor in Beaufort County, South Carolina.[1] Until 2009, the South Carolina State Ports Authority and its predecessors held easements for railroad purposes that abutted its land. Defendant United States then authorized the conversion of the railroad rights-of-way into recreational trails pursuant to the National Trail Systems Act, conduct that resulted in a taking in violation of the Just Compensation Clause of the Fifth Amendment to the United States Constitution.

Currently before the court are the parties' cross-motions for partial summary judgment as to the appropriate interest rate necessary to provide just compensation. For the reasons explained below, the court concludes that the Moody's Composite Index of Yields on Aaa Long Term Corporate Bonds ("Moody's") is the appropriate benchmark by which to calculate delay damages in this case. Therefore, the court grants plaintiff's motion for partial summary judgment and denies defendant's cross-motion.

---

[1] The case caption depicts Technical College's name as "Technical College of the Low Country" based on the complaint and cover sheet that Technical College filed upon initiating this lawsuit. However, Technical College's name is actually "Technical College of the Lowcountry" pursuant to its enabling legislation. See S.C. Code Ann. § 59-53-910 (2002).

## I. BACKGROUND

Detailed descriptions of the statutory and regulatory context of this case, initial acquisition of the land in question, and proceedings before the Surface Transportation Board are provided in the court's ruling with respect to liability and will not be repeated here.  See Tech. Coll. of the Low Country v. United States, 145 Fed. Cl. 408, 412-19 (2019).  In that ruling, the court determined that Technical College had a cognizable Fifth Amendment property interest in land adjacent to the rail corridor; that a taking of that property occurred on May 20, 2009, the date the notice of interim trail use ("NITU") was issued; and that Technical College is owed just compensation of $755,165 in principal, plus delay damages and attorney fees and costs.  Id. at 419-41.  Plaintiff subsequently filed the instant motion for partial summary judgment as to the appropriate interest rate, and defendant cross-moved for partial summary judgment.  Plaintiff also filed a response to defendant's cross-motion and a reply in support of its motion, but defendant did not file a reply in support of its cross-motion.  The court deems oral argument unnecessary.

## II. LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  R. Ct. Fed. Cl. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is genuine if it "may reasonably be resolved in favor of either party."  Id. at 250.

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact.  Celotex, 477 U.S. at 323.  The nonmoving party then bears the burden of showing that genuine issues of material fact remain for trial.  Id. at 324.  Both parties may carry their burden by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  R. Ct. Fed. Cl. 56(c)(1).

The court must view the inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party.  Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, the court must not weigh the evidence or make findings of fact. See Anderson, 477 U.S. at 249 ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."); Contessa Food Prods., Inc. v. Conagra, Inc., 282 F.3d 1370, 1376 (Fed. Cir. 2002) ("On summary judgment, the question is not the 'weight' of the evidence, but instead the presence of a genuine issue of material fact . . . ."), abrogated on other grounds by Egyptian Goddess, Inc. v. Swisa, Inc., 543 F.3d 665 (Fed. Cir. 2008) (en banc); Ford Motor Co. v. United States, 157 F.3d 849, 854 (Fed. Cir. 1998) ("Due to the nature of the proceeding, courts do not make findings of fact on summary judgment."); Mansfield v. United States, 71 Fed. Cl. 687, 693 (2006) ("[T]he Court may neither make credibility determinations nor weigh the

evidence and seek to determine the truth of the matter.  Further, summary judgment is inappropriate if the factual record is insufficient to allow the Court to determine the salient legal issues.").  Entry of summary judgment is mandated against a party who fails to establish "an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.

In ruling on cross-motions for summary judgment, the court "must evaluate each motion on its own merits."  First Commerce Corp. v. United States, 335 F.3d 1373, 1379 (Fed. Cir. 2003).  If neither party meets its burden, then the court must deny both motions.  Bubble Room, Inc. v. United States, 159 F.3d 553, 561 (Fed. Cir. 1998).

### III.  ANALYSIS

Under the Fifth Amendment, the federal government may not take private property for public use without paying just compensation.  Any delay in payment of that just compensation entitles the property owner "to interest thereon sufficient to ensure that he is placed in as good a position pecuniarily as he would have occupied if the payment had coincided with the appropriation."  Kirby Forest Indus., Inc. v. United States, 467 U.S. 1, 10 (1984).  In other words, "the delay damages should make a property owner indifferent to the timing of payment."  Hardy v. United States, 138 Fed. Cl. 344, 349 (2018).

When confronted recently with very similar circumstances in Hardy, this court employed the Prudent Investor Rule to determine that the Moody's rate properly measures delay damages.  See id. at 356.  Defendant makes no attempt to distinguish Hardy from the present case, and after reviewing the specific taking at issue here, the court sees no reason to reach a different result.

### A.  The Prudent Investor Rule Applies

While defendant correctly documents the Prudent Investor Rule's origins as a trusts concept, this origin certainly does not preclude its application to inverse condemnation proceedings.  See id. at 349.  The Prudent Investor Rule gauges "how a reasonably prudent person would have invested the funds owed by the government to produce a reasonable return while maintaining safety of principal."  Sears v. United States, 124 Fed. Cl. 730, 734 (2016) (internal quotation marks and alterations omitted).  The court evaluates this rule in light of the "strong judicial policy in favor of the establishment of a uniform rate of interest applicable to condemnation cases in order to avoid discrimination among litigants."  Miller v. United States, 620 F.2d 812, 838 (Ct. Cl. 1980).  Contrary to defendant's assertions, the Prudent Investor Rule achieves this objective.  Courts have frequently instructed that the Prudent Investor Rule relies on the experiences of a hypothetical "reasonably prudent person" rather than "a particular plaintiff."  See Tulare Lake Basin Water Storage Dist. v. United States, 61 Fed. Cl. 624, 627 (2004);[2] accord Hardy, 138 Fed. Cl. at 350 ("[T]he Prudent Investor Rule is an inherently

---

[2] This court is not prepared to disregard Tulare, as defendant urges in its motion.  Defendant contends that "while the Tulare court purportedly sought to satisfy the goal of uniformity, it did so only among the plaintiffs before it based on knowledge of the specific, subjective general risk preferences and actual returns earned by those plaintiffs on investments

objective inquiry that applies uniformly to all plaintiffs."); Biery v. United States, Nos. 07-693L & 07-675L, 2012 WL 5914521, at *3 (Fed. Cl. Nov. 27, 2012) (rejecting the assertion of defendant's expert that the Prudent Investor Rule cannot be applied "without an understanding of the investment goals, time horizon, and risk tolerance of the particular investor"). Moreover, the Prudent Investor Rule appropriately accounts for this hypothetical investor's loss of investment opportunities, "a fundamental component of delay damages."[3] Hardy, 138 Fed. Cl. at 350. Thus, the court agrees with plaintiff that the Prudent Investor Rule offers the most accurate mechanism to evaluate the interest rates proposed by the parties.

### B. The Moody's Rate Properly Measures Delay Damages

Having determined that it is appropriate to apply the Prudent Investor Rule, the court applies the rule to the specific interest rates proposed by the parties. Plaintiff urges the court to use the Moody's rate. Defendant contends that the interest rate set out in the Declaration of

---

they made during the period in question." Def. Mot. 14. But Tulare can be fully reconciled with both the Prudent Investor Rule and the uniformity goals articulated by the United States Court of Claims in Miller. The Tulare court pointedly refused to apply an interest rate based on "the agricultural operating loan rates prevailing in the Tulare/Kern County services area for the period 1992-1994," 61 Fed. Cl. at 627, because this approach "would require the application of different interest rates depending on the water contractors' unique borrowing circumstances," id. at 629. Although the court ultimately chose an interest rate tied to the rates received by Tulare and Kern County on their state-operated investment accounts, id. at 628, the court emphasized that it "d[id] not mean to stress the actual experience of plaintiffs as individual investors," id. at 629. This court also observes that the Moody's rate was not proposed by either party in Tulare and was not substantively considered by that court. See id. at 627-28 (describing the parties' proposed interest rates).

[3] Defendant cites United States v. Powelson, 319 U.S. 266, 281-82 (1943), to support its contention that just compensation does not include an owner's loss of investment opportunities. The property owner in Powelson asserted that the fair market value of his condemned land should be calculated based on the theory that, had he been able to develop it as planned, the condemned property "could be united with numerous other tracts owned by strangers for the construction of an elaborate four-dam hydroelectric project." 319 U.S. at 270. In rejecting this argument, the Supreme Court emphasized that "[the landowner's] project was only a speculative venture—a promotional scheme wholly in futuro." Id. at 281. Such a "speculative venture" stands in sharp contrast to plaintiff's lost investment opportunities. Here, we are concerned with the calculation not of fair market value, but of delay damages. Because any just compensation paid at the time of the taking would have been available to plaintiff for reinvestment, "[j]ust compensation requires the payment of compound interest to replace the investment opportunities plaintiff[] lost when the government took [its] property." Whitney Benefits, Inc. v. United States, 30 Fed. Cl. 411, 416 (1994).

Takings Act ("DTA") is more appropriate.[4]

The DTA controls direct condemnation actions instituted in federal court.  40 U.S.C. § 3113.  Thus, while the DTA applies in eminent domain cases, "[i]ts provisions are not binding on other types of Fifth Amendment takings cases, such as . . . rails-to-trails case[s]."  Sears, 124 Fed. Cl. at 734 n.3; accord Hardy, 138 Fed. Cl. at 350 ("Congress could have applied the DTA rate to inverse condemnation actions but did not do so."); Tulare, 61 Fed. Cl. at 629 ("[T]he legislative history of the [DTA] suggests that Congress did not contemplate the application of the 52-week Treasury bill rate to any situation other than a formal declaration of taking.").  The court acknowledges that "the rate of interest set by a statute can be applied . . . if such rate is reasonable and judicially acceptable."  Miller, 620 F.2d at 837.  Such is not the case here.  Defendant fails to recognize two critical distinctions between direct and inverse condemnation proceedings that make the DTA rate a poor fit for the needs of the instant case.[5]  First, inverse condemnation often involves a much longer gap between the taking of the property and the payment of just compensation.[6]  Tulare, 61 Fed. Cl. at 629-30; see, e.g., Furlong v. United States, 132 Fed. Cl. 630, 631 (2017) (fourteen-year gap between date of taking and final settlement agreement); Pitcairn v. United States, 547 F.2d 1106, 1115 (Ct. Cl. 1976) (seventeen-year gap between date of taking and expiration of final patent involved).  The DTA, which was enacted to give the government "immediate possession" of property while providing "immediate cash compensation" to the former owner, United States v. Miller, 317 U.S. 369, 381 (1943), does not contemplate such delays.  During those intervening months or years, the property owner faces a loss of liquidity foreign to the direct condemnation process.  See 31 U.S.C. § 3727(a)-(b) (2012) (prohibiting the assignment of claims against the United States, effectively preventing property owners from liquidating their claims through a sale or pledging those claims as collateral for a loan during inverse condemnation proceedings).  As other judges of this court have reasoned, "[t]hat detriment should . . . be taken into account in the court's determination of an appropriate interest rate."  Sears, 124 Fed. Cl. at 736.

Second, the DTA rate "contemplates an award of just compensation from the perspective of the government's cost of borrowing rather than from the perspective of the claimant's rate of

---

[4] The DTA rate is tied to the "weekly average one-year constant maturity Treasury yield . . . for the calendar week preceding the date of taking."  40 U.S.C. § 3116(a)(1) (2006).  The Treasury yield is measured by a security known as the 52-week Treasury bill.

[5] Defendant cites City of Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 734 (1999) (Souter, J., concurring in part and dissenting in part), in support of the proposition that "the standard for measuring 'just compensation' is the same whether in a direct condemnation or inverse condemnation."  Def. Mot. 8.  This court previously addressed defendant's reliance on Monterey in Hardy.  See Hardy, 138 Fed. Cl. at 350-51.  Here, the court reiterates that the minority opinion in Monterey addressed the principal portion of the award, not delay damages.  See id.

[6] In the instant case, over a decade has elapsed between the issuance of the NITU and the date of this decision.  Tech. Coll., 145 Fed. Cl. at 426 (finding that the NITU issued on May 20, 2009, effected a taking of Technical College's property).

return." Tulare, 61 Fed. Cl. at 630.  This approach is improper—in fact, just compensation requires the exact opposite.  "[J]ust compensation in the constitutional sense is what the owner has lost, and not what the condemnor has gained." Pitcairn, 547 F.2d at 1122 (quoting Julius L. Sackman, Nichols on Eminent Domain § 8.61 (3d ed., rev. 1975)).  This shift in perspective is necessary for two reasons.  First, inverse condemnation proceedings such as the one at issue here make the property owner "an involuntary lender to a debtor he would often prefer not to have." Redevelopment Agency v. Gilmore, 700 P.2d 794, 806 (Cal. 1985).  Accordingly, it is only fair that "[t]he Government, not the unwilling condemnee, should be the one to bear the risk of any fluctuations in interest rates." Miller, 620 F.2d at 839; see also Gilmore, 700 P.2d at 806 ("[T]he risk of any difference between the rates the government would normally pay, and those the condemnee could have achieved by prudent participation in the broader market, should fall on the former.").  Second, the government and private parties are not similarly situated as borrowers.  A property owner such as the plaintiff here "is hardly likely to be able to borrow money at the rates the Government can." Pitcairn, 547 F.2d at 1122.  Thus, from the condemnee's perspective, the DTA rate simply does not reflect its economic reality.

Given the well-documented concerns regarding the fairness of the DTA rate, the court turns to the Moody's rate proposed by plaintiff and finds that it "is the more accurate measure of the economic harm of the property owners." NRG Co. v. United States, 31 Fed. Cl. 659, 670 n.8 (1994).  The Prudent Investor Rule counsels us to apply a rate of interest that, unlike the government's borrowing practices, relies on a diversified investment strategy. See Tulare, 61 Fed. Cl. at 630; accord United States v. 429.59 Acres of Land, 612 F.2d 459, 465 (9th Cir. 1980) ("Because a reasonably prudent investor would diversify his risk, it is proper to consider the rate of interest paid on different types of securities with different maturities.").  The Moody's rate provides just such an investment strategy.  "[L]ong-term corporate bond yields are an indicator of broad trends and relative levels of investment yields or interest rates," with the added benefit that they "cover the broadest segment of the interest rate spectrum." Pitcairn, 547 F.2d at 1124.  This investment portfolio paints a much more probable picture of the likely strategy of the reasonably prudent investor, who is unlikely to invest solely in 52-week Treasury bills.

Defendant fears that using the Moody's rate will overcompensate plaintiff, asserting that the risk levels associated with corporate bonds do not match those associated with Treasury bonds. See NRG, 31 Fed. Cl. at 665 (explaining that "private commercial [interest] rates are higher than rates on comparable term Treasury securities because private commercial rates incorporate the risk that a private entity borrowing the money will not be able to repay the loan on time").  As plaintiff emphasizes in its response brief, property owners subject to inverse condemnation proceedings face critical forms of risk such as uncertainty over exact compensation, uncertainty over the timing of compensation, and illiquidity.  Furthermore, although defendant insists that the risks incorporated into the Moody's rate are inapplicable when payment comes from the United States, the court is not necessarily required to "take into account the risk-free nature of the Government's obligation to pay any deficiency award." 429.59 Acres of Land, 612 F.2d at 464.

Defendant's demand that plaintiff demonstrate "special proof" to justify departure from the DTA rate falls equally flat.  This court has rejected the DTA rate in some instances without requiring the presentation of individualized evidence. See Tektronix, Inc. v. United States, 552

F.2d 343, 352-53 (Ct. Cl. 1977) (instructing that the Pitcairn rates "should be applied (from now on) to just compensation cases, without need of proof in the individual instance"). As discussed above, the inherent distinctions between direct and inverse condemnation proceedings, coupled with the thoroughly documented ways that the DTA rate fails to justly compensate "involuntary lenders," provide ample justification for departing from the DTA rate. Moreover, in its search for "special proof" of the economic conditions prevailing since the NITU was issued, defendant shuts its eyes to recent cases that have applied the Moody's rate to inverse condemnation proceedings involving the same years as the present case. Plaintiff's property was taken on May 20, 2009, Tech. Coll., 145 Fed. Cl. at 426, and plaintiff has not yet been compensated. In Hardy, this court applied the Moody's rate to a 2013 taking where delay damages were not adjudicated until 2018. Hardy, 138 Fed. Cl. at 347-48. In Adkins v. United States, the Moody's rate was applied to a 2003 taking where delay damages were not adjudicated until 2014. Nos. 09-503L, 09-241L & 09-158L, 2014 WL 448428, at *2 (Fed. Cl. Feb. 4, 2014). In Biery, the Moody's rate was applied to a 2004 taking where delay damages were not adjudicated until 2012. 2012 WL 5914521, at *4. And in Sears, the Moody's rate was employed to determine the interest accruing on a taking after February 2016. 124 Fed. Cl. at 736-37. Given the considerable temporal overlap between the instant case and similarly reasoned cases from the past decade, this court "will not depart from the consensus that has emerged since 2009 in the Court of Federal Claims that the Moody's rate is the appropriate benchmark by which to award delay damages in the Rails-to-Trails context." Hardy, 138 Fed. Cl. at 356.

### C. The Interest Shall Be Compounded

Prudent investment practices compel the compounding of interest. See Brunswick Corp. v. United States, 36 Fed. Cl. 204, 219 (1996) (determining that interest must be compounded "since no prudent, commercially reasonable investor would invest at simple interest"). The parties agree that simple interest is not appropriate, though they appear to suggest that the interest be compounded using different timelines.[7] As in Hardy, 138 Fed. Cl. at 357, the court determines that interest in this case should be compounded quarterly. Accord Sears, 124 Fed. Cl. at 736-37.

### IV.  CONCLUSION

The court has considered all of the parties' arguments. To the extent not discussed herein, they are unpersuasive, meritless, or unnecessary for resolving the issue of the appropriate interest rate.

No genuine issue of material fact is currently before the court. Plaintiff is entitled to delay damages between the date of taking and the date of payment at an interest rate equivalent to the Moody's rate, compounded quarterly, pursuant to the Prudent Investor Rule. Accordingly,

---

[7] Plaintiff asks the court to compound interest quarterly. Defendant only mentions compounded interest in the context of the DTA. See, e.g., Def. Mot. 2-3 ("The DTA . . . provides . . . for interest to be compounded annually when interest runs for a period greater than one year."). Defendant makes no effort to rebut plaintiff's request for quarterly compounding, and neither party provides substantive arguments to support their approach.

the court **GRANTS** plaintiff's motion for partial summary judgment and **DENIES** defendant's cross-motion for partial summary judgment.

By **no later than Monday, March 9, 2020**, the parties shall file a joint status report proposing the amount of judgment that should be entered in this case pursuant to Rule 54(b) of the Rules of the United States Court of Federal Claims.  The parties shall specify how much of the proposed amount is attributable to delay damages, assuming the judgment will be paid on **Tuesday, March 31, 2020**.  Additionally, the parties shall indicate the specific numerical interest rate that applies for future delay damages, if any, beyond March 31, 2020, which shall continue to be compounded quarterly.  Agreement upon an amount of judgment does not signify agreement with the court's findings and conclusions, waive any arguments or rights the parties might otherwise have, or impact either party's right to an appeal.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney<br>
MARGARET M. SWEENEY<br>
Chief Judge